# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ADA LISS GROUP (2003), )
formerly known as ADA LISS LTD., )
)
      Plaintiff, )   **MEMORANDUM OPINION**
)   **AND RECOMMENDATION**
      v. )
)      1:06CV610
SARA LEE CORPORATION )
(formerly d/b/a Sara Lee Branded )
Apparel) and HANESBRANDS, )
INC., )
)
      Defendants. )

     This matter is before the court on a motion to dismiss by Defendants Sara Lee Corporation and Hanesbrands, Inc. (docket no. 121) and on a motion for partial summary judgment by Plaintiff Ada Liss Group (docket no. 133). The parties have responded in opposition to the motions, and the matter is ripe for disposition. Because the parties have not consented to the jurisdiction of the magistrate judge, the motions must be dealt with by way of recommendation. For the following reasons, it will be recommended that the district court deny Defendants' motion to dismiss in part and grant it in part. It will be further recommended that the court grant Plaintiff's motion for partial summary judgment.

-1-

## BACKGROUND

Plaintiff Ada Liss Group filed this action against Defendants Sara Lee Branded Apparel Division ("Sara Lee") and Hanesbrands, Inc. alleging claims for negligent misrepresentation and/or fraud, unfair and deceptive trade practices, and breach of the implied covenant of good faith and fair dealing. The claims stem from two distributorship agreements and a settlement agreement entered into between Plaintiff and Sara Lee arising out of Plaintiff's status as the exclusive distributor of certain of Sara Lee's products in Israel.[1]

Plaintiff originally filed this case in Wake County Superior Court on February 15, 2006. In the original complaint, Plaintiff brought only a claim for breach of contract. On March 17, 2006, Sara Lee removed the case to the Eastern District of North Carolina based on diversity jurisdiction. After the case was removed, Sara Lee's assignee, Hanesbrands, was added as a co-defendant. On March 24, 2006, Sara Lee filed a motion to dismiss for improper venue or, alternatively, to transfer venue to this district.

On June 30, 2006, the Eastern District transferred the case to this court. On July 14, 2006, Sara Lee filed an Answer to Plaintiff's Complaint. Discovery commenced after the court approved the parties' Rule 26(f) report on August 23,

---

[1] Ada Liss and Sara Lee were the original signatories to the contracts at issue here. Hanesbrands is a spin-off of Sara Lee and is alleged to be the assignee of the contracts. The court will refer to Sara Lee and Hanesbrands collectively as "Defendants" unless the court is specifically referring to Defendant Sara Lee.

-2-

2006.  Sara Lee subsequently filed a motion for judgment on the pleadings on November 22, 2006.  On December 12, 2006, Plaintiff filed a motion to amend the complaint.  On January 12, 2007, Plaintiff filed a motion to remand.

On February 26, 2007, the undersigned granted Plaintiff's motion to amend the complaint, denied Plaintiff's motion to remand, and held that Defendant Sara Lee's motion for judgment on the pleadings was moot since the amended complaint superseded the original complaint.  On May 31, 2007, the district court adopted these rulings.  Furthermore, on April 12, 2007, Defendants filed a motion to dismiss the amended complaint.  On July 2, 2007, the undersigned recommended that the court deny Defendants' motion to dismiss in part and grant it in part.  To this extent, the undersigned recommended that the court dismiss all claims by Plaintiff for recovery of incidental or consequential damages and/or lost profits for breach of the 2004 Distributorship Agreement and that the court should otherwise deny the motion to dismiss.  On December 28, 2007, the district court adopted the Recommendation of the undersigned.

On March 4, 2008, the court entered an order allowing Plaintiff to take a voluntary dismissal without prejudice, after Plaintiff stipulated that it would abide by certain terms and conditions upon refiling.  On August 13, 2008, Plaintiff filed a motion to reopen the case, which the court subsequently granted.  Plaintiff filed a new complaint with the motion to reopen.  The complaint filed on August 13, 2008, brings the following claims for relief: (1) Count I–Breach of the 1994 Distributorship

-3-

Agreement; (2) Count II–Breach of the 2004 Settlement Agreement; (3) Count III–Breach of the 2004 Distributorship Agreement; (4) Count IV–Fraud; (5) Count V–Negligent Misrepresentation; (6) Count VI–Unfair and Deceptive Trade Practices; and (7) Count VII–Breach of Duty of an Implied Covenant of Good Faith and Fair Dealing.

Defendants have now filed the pending motion to dismiss, requesting that the court dismiss Plaintiff's claims for fraud, negligent misrepresentation, unfair and deceptive trade practices, and breach of the implied covenant of good faith and fair dealing. Defendants further seek a finding from the court that the damages exclusion provisions in the Distributorship Agreements apply to all of Plaintiff's claims, including the newly alleged tort claims, therefore prohibiting recovery of lost profits and damages for diminution in the value of the distributorship. Furthermore, Plaintiff has filed a motion for partial summary judgment, seeking a finding from the court that Defendants have breached the 2004 Settlement Agreement.

**FACTS**

The following facts are taken from the Complaint filed on August 13, 2008, and are assumed to be true for the purpose of Defendants' motion to dismiss. Ada Liss is an Israeli company that imports and sells women's intimate apparel to retailers in Israel. (Compl. ¶¶ 21-22.) Ada Liss's president is Ervin Lissauer. (*Id.* ¶ 22.) In 1994, Sara Lee and Ada Liss entered into a Distributorship Agreement pursuant to

-4-

which Ada Liss began purchasing Bali-branded intimate apparel from Sara Lee.[2]  (*Id.* ¶¶ 27-34.)  The 1994 Distributorship Agreement granted Ada Liss the exclusive right to distribute Bali-branded intimate apparel ("Products") in Israel and the territories (hereinafter referred to as "Israel" or the "Territory").  (*Id.*)  Under the Agreement, Defendant Sara Lee was "prohibited from (a) selling the Products to anyone in the Territory other than Ada Liss, and (b) selling the Products to anyone whom [Defendant] 'knows or has reason to believe is likely to resell or deliver the Products to customers located in the Territory.'"  (*Id.* ¶ 32.)

Ada Liss alleges that beginning in 2000, Ada Liss first noticed "parallel imports" in its Territory, *i.e.*, products that were imported into the Territory by persons or companies other than Ada Liss (hereinafter referred to simply as "Products").  (*Id.* ¶¶ 36-37.)  Ada Liss alleges that these Products violated Ada Liss's exclusive distributorship rights and were sold at prices far below those that Ada Liss was able to charge retailers for legitimately imported Products because the illegitimate importers purchased Products from Sara Lee at deeply discounted prices.  (*Id.*)  Ada Liss notified Sara Lee that parallel imports were penetrating the market and that they were causing Ada Liss to lose market share.  (*Id.* ¶¶ 38-39.)

Plaintiff further alleges that over the next several years, it repeatedly informed Sara Lee that Atlantic Hosiery in Miami was supplying one of the major parallel

---

[2]  Sara Lee formerly conducted business as Sara Lee Branded Apparel and Hanesbrands, Inc., but will simply be referred to as Sara Lee in this Recommendation.

importers in Israel–Shmuel Avrahami of Sera Lingerie–with Bali Products. (*Id.* ¶¶ 40-51.) Plaintiff alleges that Atlantic Hosiery was purchasing Bali Products from Sara Lee at prices far below what Sara Lee charged Plaintiff for the same Products. (*Id.* ¶¶ 37, 40-42, 49.) In 2003, Plaintiff notified Sara Lee that Atlantic Hosiery was also supplying an Israeli firm, Peer G.I.A., with parallel imports. (*Id.* ¶¶ 53-55.)

In February 2004, Sara Lee sent export manager Fabian Bouquet to Israel to investigate the problem of parallel imports. (*Id.* ¶¶ 60-61.) During the trip to Israel, Bouquet confirmed the existence of large quantities of parallel imports of Bali Products and that Atlantic Hosiery was supplying Bali Products to Mr. Avrahami of Sera Lingerie. (*Id.* ¶¶ 60-66.) Bouquet confirmed that parallel imports (1) were affecting active (not discontinued) Bali styles; (2) were widely available at premium retail locations; (3) were offered to Israeli retailers at an average discount of 40 percent below Plaintiff's prices; and (4) were damaging Plaintiff's business. (*Id.* ¶¶ 60-70.)

In a written report dated February 20, 2004, Bouquet submitted his findings to Sara Lee's in-house counsel. (*See id.* ¶¶ 62-72 & Ex. 1.) Plaintiff alleges that although Sara Lee knew that parallel imports were originating from its U.S. wholesale customers and that Sara Lee's sales to its U.S. customers such as Atlantic Hosiery were damaging Ada Liss's business, Defendants continued to sell Bali Products to those same customers, thereby breaching the 1994 Distributorship Agreement. (*See id.* ¶¶ 81-88, 359-65.) Plaintiff notes in an e-mail dated April 14,

-6-

2004, it notified Sara Lee, including in-house counsel Christopher Fox, that Plaintiff's damages "are measured in millions of US dollars." (*Id.* ¶ 106.)

Shortly after Bouquet's investigation in Israel, Sara Lee's in-house counsel Christopher Fox proposed to Ada Liss that Sara Lee would begin to "mark" Bali Products to catch the U.S. wholesalers supplying the parallel importers. (*Id.* ¶ 89.) Fox again proposed marking in August 2004. (*Id.* ¶ 91.) Plaintiff alleges that in October 2004, Plaintiff notified Sara Lee that another Sara Lee customer, Hosiery Street (in New York), was supplying parallel imports through Mayer Gelbart, and that Gelbart was running Hosiery Street's website. (*Id.* ¶¶ 12, 173-88.) Plaintiff alleges that for at least a year after Sara Lee received this information, the Sara Lee-Gelbart-Hosiery Street supply chain continued to thrive as Gelbart received Products directly from Sara Lee. (*See id.* ¶¶ 186-88.)

To resolve the parallel imports dispute, Ada Liss's president Lissauer traveled from Israel to Winston-Salem, North Carolina and met on November 1-2, 2004, with Sara Lee's legal counsel Fox and Mickey Swaim, Vice-President of Operations for Sara Lee's Asia division. On November 2, 2004, Ada Liss and Sara Lee executed a second Distributorship Agreement as well as a Settlement Agreement. (*Id.* ¶¶ 92-98, 138-65.) Under the 2004 Distributorship Agreement, Plaintiff was again given an exclusive right to distribute Bali-branded intimate apparel in the Territory. (*Id.*) Moreover, as with the 1994 Distributorship Agreement, under the 2004 Distributorship Agreement Defendant Sara Lee was again prohibited from (a) selling

the Products to anyone in the Territory other than Ada Liss, and (b) selling the Products to anyone whom Sara Lee knew or had reason to believe was likely to resell or deliver the Products to customers located in the Territory. (*Id.* ¶¶ 138, 143.) In the Settlement Agreement, Sara Lee promised to take certain actions in an effort to stop parallel imports, including "mark[ing] Bali Products being sent to various wholesalers" in order to track the origin of the parallel imports. (*Id.* ¶¶ 92-98.) In exchange, Ada Liss agreed to release Defendant from liability for existing claims concerning parallel imports from June 1, 1994, up to the date of the Settlement Agreement. (*Id.* ¶ 135.)

Plaintiff alleges that before Lissauer signed the Settlement Agreement, he asked counsel Fox how marking would work and whether it would be too expensive for Sara Lee. (*Id.* ¶ 100.) Fox responded that marking would be relatively easy: Sara Lee would apply a transparent spray to Products sold to various wholesalers to distinctively mark the Products sold to them. (*Id.*) If parallel imports came into Israel, then the Product could be examined with a machine to identify which wholesaler had purchased what Product. (*Id.*) Fox also told Lissauer that Sara Lee would begin marking the Products "immediately" and that marking would permit Sara Lee to trace the source of the parallel imports. (*Id.* ¶¶ 101-02.) Fox further promised that Sara Lee would cut off sales to its customers who were supplying the parallel imports and that marking would give Ada Liss a truly exclusive distributorship. (*Id.* ¶¶ 99-103.)

-8-

Plaintiff alleges that Sara Lee, in fact, never intended to mark, trace the sources of the parallel imports, cut off sales to customers supplying the parallel imports, or give Plaintiff a truly exclusive distributorship. (*Id.* ¶¶ 109-12.) Plaintiff alleges that at that time, neither counsel Fox nor Sara Lee had any idea whether marking was feasible and had no plans at all to actually implement it. (*Id.* ¶¶ 113-16.) Indeed, Plaintiff notes that during late 2006 and early 2007, the parties conducted document discovery. Plaintiff requested records of Sara Lee's intentions to mark Products, but Sara Lee produced no records whatsoever to show that it ever had any intention of marking. (*Id.* ¶¶ 121-32.) Plaintiff maintains, for instance, that there is no record of how Sara Lee planned to fulfill the marking obligations in the Settlement Agreement, nor is there any record indicating that Sara Lee's counsel ever instructed Sara Lee's manufacturing/assembly personnel to implement a marking system, or that the legal department ever inquired about the cost, feasibility, or safety of the chemical spray discussed by counsel Fox. (*Id.*)

Plaintiff alleges that Sara Lee fraudulently induced Plaintiff to sign the Settlement Agreement simply to obtain a release of Sara Lee's "multi-million dollar liability" to Plaintiff. (*See* Pl.'s Response Br., p. 6.) Plaintiff further alleges that it subsequently purchased more than $600,000 in Products from Sara Lee in further reliance on Sara Lee's promises of marking and exclusivity. (Compl. ¶ 137.)

According to Plaintiff, in the two weeks after the 2004 Distributorship Agreement and the 2004 Settlement Agreement were signed, Sara Lee gave Plaintiff

"false wishes of future success" in selling Bali Products. (*Id.* ¶¶ 166-70.) Plaintiff also alleges that Sara Lee obtained Plaintiff's agreement to participate in Sara Lee's co-op advertising program. (*Id.* ¶¶ 162-65.) A few months later, Sara Lee still had not marked any Products. On March 23, 2005, Sara Lee employee Sammie Shanks asked Lissauer to forward samples of parallel imports and falsely indicated to him that Sara Lee had already marked Bali Products and that Sara Lee should be able to identify the customers who purchased the Products from Sara Lee. (*Id.* ¶¶ 189, 200-04.) Thereafter, Sara Lee again informed Plaintiff that it was conducting an investigation and again requested that Plaintiff obtain samples of parallel imports and send them to Sara Lee. (*Id.* ¶¶ 207-32.) Plaintiff alleges that, in fact, Sara Lee was not marking Products for the purpose of identifying the source of parallel imports. Plaintiff further alleges that "while Sara Lee was going through the charade of an investigation, it was in fact delivering Products directly to Mayer Gelbart, who at that time was a known conduit to one of the parallel importers, his sister-in-law Heniya Gelbart," who ran a company named Gym Gal. (Pl.'s Response Br., p. 7, citing Compl. ¶¶ 12, 176, 192, 227-29.)

Plaintiff further alleges that as part of Sara Lee's "sham investigation" in early May 2005, Shanks falsely represented that Sara Lee's legal department was prepared to act when the samples arrived, *id.* ¶¶ 210-11, and that Sara Lee would be pursuing the sources of the parallel imports, *id.* ¶¶ 212-14. On June 21, 2005, Lissauer notified Shanks that large quantities of parallel imports were still coming

-10-

into the Territory and asked about the status of Sara Lee's investigation. (*Id.* ¶ 216.) Plaintiff alleges that Shanks acknowledged receipt of the samples and falsely claimed that Sara Lee's in-house counsel Grady Crosby was investigating the matter. (*Id.* ¶¶ 216-18.)

On July 25, 2005, Plaintiff informed Sara Lee that all twelve of the Bali styles that Defendants sold to Hosiery Street were being imported into the Territory by Heniya Gelbart and her company Gym Gal. (*Id.* ¶¶ 176, 221-24.) Plaintiff contends that at that time Lissauer requested that Sara Lee stop selling to Hosiery Street, and that counsel Crosby falsely represented to Lissauer that Sara Lee intended to cut off sales to Hosiery Street. (*See id.* ¶¶ 223-25.) Plaintiff contends that Sara Lee did not, however, cut off sales to Hosiery Street and that Sara Lee instead delivered Bali Products directly to Mayer Gelbart, despite Sara Lee's actual knowledge of the Hosiery Street-Gelbart-Gym Gal supply chain for parallel imports. (*Id.* ¶¶ 226-29.)

Plaintiff contends that on or about August 19, 2005, after repeated requests by Plaintiff for information regarding Sara Lee's purported "investigation," counsel Crosby admitted that Sara Lee had not marked any Products. (*Id.* ¶ 232.) At that time Crosby allegedly falsely represented that (1) Sara Lee had developed a strategy to distinctively mark Products sold to Hosiery Street and Atlantic Hosiery; (2) Sara Lee would notify Plaintiff once it had marked the Products sold to those customers; (3) Sara Lee needed more evidence from Plaintiff to verify that Hosiery

-11-

Street was a source of parallel imports; and (4) Plaintiff needed to provide more samples of parallel imports. (*Id.*)

Plaintiff contends that it is undisputed that Sara Lee never marked any of the Bali Products and, furthermore, that Sara Lee continued to sell Bali Products to Atlantic Hosiery, Hosiery Street, and others with actual knowledge that the Products would be sold in the Territory. (*Id.* ¶¶ 238-49.) Plaintiff contends that the false assertions of the intent to mark Products and further requests for samples by Fox, Shanks, and Crosby were part of a scheme intended to induce Plaintiff into believing that Defendants were abiding by the 2004 Distributorship Agreement and the 2004 Settlement Agreement to avoid legal action by Plaintiff. (*See id.* ¶ 196.) Plaintiff contends that Sara Lee's scheme was also motivated by profiting from selling Bali Products to third parties in the United States, even though parallel imports of these Bali Products subsequently entered the Territory and harmed Ada Liss. (*Id.* ¶ 197.) Plaintiff contends by implementing an unfair pricing strategy in which it sold the Bali brand to U.S. wholesalers at cheaper prices than it would sell to Plaintiff, Sara Lee was able to dispose of inventory while putting Plaintiff at a significant price disadvantage. (*Id.* ¶¶ 16, 36-37, 298-305.)

In October 2005, Shishir Babu, Sara Lee's Senior Vice President, visited Israel, saw first-hand that parallel imports were problematic and were damaging Plaintiff's business, and conceded to Plaintiff that Sara Lee had not marked any of the Bali Products because it was "too expensive." (*Id.* ¶¶ 262-64, 266.) Babu

-12-

promised Lissauer, however, that Sara Lee would compensate Plaintiff for its damages, would stop the parallel imports, and would sue the parallel importers. (*Id.* ¶ 268.) According to Plaintiff, instead of doing this, Sara Lee subsequently refused Plaintiff's pre-suit request for any documents showing that Sara Lee had in fact marked any Products and then made a bad faith denial of the obligation to mark Products. Specifically, counsel Crosby sent a letter to Plaintiff in November 2005 asserting, for the first time, that the Settlement Agreement did not require marking and that Sara Lee would not mark the Products because Sara Lee did not believe marking would be effective. (*Id.* ¶ 296 & Ex. 2.)

Based on the above-cited allegations, Plaintiff asserts claims for breach of both the 2004 Distributorship Agreement and the 2004 Settlement Agreement. Plaintiff also contends that because Defendant breached the 2004 Settlement Agreement, that agreement is null and void and Plaintiff is entitled to bring claims for breach of the 1994 Distributorship Agreement. Plaintiff also brings tort claims for fraud/fraudulent inducement, negligent misrepresentation, unfair and deceptive trade practices, and breach of the implied covenant of good faith and fair dealing.

**DISCUSSION**

In ruling on a motion to dismiss for failure to state a claim, it must be recalled that the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the action. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F. Supp. 811, 813 (M.D.N.C. 1995). At this stage of the litigation, a plaintiff's well-pleaded allegations are taken

-13-

as true, and the complaint, including all reasonable inferences therefrom, is liberally construed in the plaintiff's favor. *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 327 (4th Cir. 1996).

Generally, the court looks only to the complaint itself to ascertain the propriety of a motion to dismiss. *See George v. Kay*, 632 F.2d 1103, 1106 (4th Cir. 1980). A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *See Bolding v. Holshouser*, 575 F.2d 461, 464 (4th Cir. 1978). This duty of fair notice under Rule 8(a) requires the plaintiff to allege, at a minimum, the necessary facts and grounds that will support his right to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As the Supreme Court has recently instructed, although detailed facts are not required, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted).[3]

_____

[3] Since this a diversity case, North Carolina's choice-of-law rules apply to the contract and tort claims here. Both parties agree, and I concur, that application of North Carolina's rule of *lex loci contractus* to the contract claims here results in the application of the substantive contract law of North Carolina. As for the alleged torts of fraud and negligent misrepresentation, North Carolina generally adheres to the rule of *lex loci delicti*, the law of the state where the injury occurred. *Hensley v. Nat'l Freight Transp., Inc.*, __ N.C. App. __, 668 S.E.2d 349, 351 (2008). Both parties assumed in their initial briefs that the substantive law of North Carolina applies to the tort claims for fraud and negligent misrepresentation. Because Plaintiff is located in and operates its business in Israel, however, I ordered the parties to submit further briefing on the issue of whether Israeli law should apply to these tort claims. After reviewing the parties' supplemental briefs on the choice-of-law issue, I agree that it is appropriate to apply the substantive law of North

<u>Whether the Damages Exclusion in the 2004 Distributorship Agreement Prohibits</u>

<u>Incidental or Consequential Damages and/or Lost Profits Arising out of Plaintiff's Tort</u>

<u>Claims and Whether Plaintiff's Damages Claim Based on "Diminution in Value" Is</u>

<u>Barred as a Consequential Damage</u>

The 1994 and 2004 Distributorship Agreements state in identical terms in Paragraph 12(c):

> Neither party hereto *shall be liable under any circumstances whatsoever, including any breach of its obligations hereunder*, to the other party for any incidental or consequential damages and/or any claims for lost profits.

(Defs.' Ex. A ¶ 12(c); Defs.' Ex. B ¶ 12(c) (emphasis added). In the initial complaint, Plaintiff alleged only claims for breach of contract; it did not allege any tort claims. This court previously held that Paragraph 12(c) is enforceable against Ada Liss as to its claims for breach of the Distributorship Agreements.[4] In support of the current motion to dismiss, Defendants now contend that Paragraph 12(c) prohibits Plaintiff from recovering incidental, consequential, and lost profits damages under *any* cause of action, including Plaintiff's pending tort claims.

---

Carolina to Plaintiff's tort claims because the parties have shown that there are no significant differences between Israeli and North Carolina law regarding the alleged torts of fraud and negligent misrepresentation.

[4] The court further held that the bar of recovery for incidental or consequential damages and/or lost profits in Paragraph 12(c) does not apply to any claims arising out of the 2004 Settlement Agreement because the Settlement Agreement is a separate contract. In the pending motion to dismiss, Defendants still contend that Paragraph 12(c) also applies to Plaintiff's claims arising out of the 2004 Settlement Agreement. Defendants' argument is simply incorrect.

I agree with Defendants that the plain language of Paragraph 12(c) prohibits Plaintiff from recovering incidental, consequential, and/or lost profits damages, regardless of whether the underlying claims are based in tort or contract.[5] S*ee, e.g., Lincoln Pulp & Paper Co. v. Dravo Corp.*, 445 F. Supp. 507, 517 (D. Me. 1977) (interpreting a provision that excluded consequential damages "of any nature arising from any cause whatsoever" as excluding liability arising from all of plaintiff's claims, including both contract and tort claims); *see generally Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 328 (1st Cir. 2008) (enforcing a damages exclusion provision in a sales contract to exclude liability for negligence, and noting that exculpatory clauses permit parties to make "sensible business judgments" allocating risk).

Defendants further contend that the bar to consequential damages in Paragraph 12(c) includes damages for diminution in value of the distributorship. I agree. Consequential damages are defined under North Carolina law as damages that do not necessarily result from the breach. *See Piedmont Plastics, Inc. v. Mize Co.*, 58 N.C. App. 135, 140, 293 S.E.2d 219, 223 (1982). In its original complaint, Plaintiff sought damages for lost profits. In a previous Recommendation adopted by the district court, the undersigned held that the 2004 Distributorship Agreement bars

---

[5] Plaintiff places great emphasis on the fact that Defendants did not raise this argument in the prior motion to dismiss. As Defendants note, however, the issue of whether the damages exclusion provision applies to tort claims was not before the court in the prior motion to dismiss because the initial complaint did not allege any tort claims.

recovery of damages for all lost profits, regardless of whether they are characterized as "consequential" or "direct" damages. In the newly filed complaint, Plaintiff seeks damages based on "diminution in value." Plaintiff contends that damages based on diminution in value are not barred under Paragraph 12(c) because they are direct, rather than consequential, damages flowing from Defendants' alleged breach of the contracts at issue. That is, Plaintiff contends that it was an entirely natural result that if Defendants kept selling Bali Products to Atlantic Hosiery and Hosiery Street–who Defendants knew were supplying parallel imports–Plaintiff would not receive an exclusive distributorship.

I agree with Defendants that the alleged diminution in the value to Plaintiff's business is a consequential, rather than a direct, damage which is barred under Paragraph 12(c). First, as Defendants note, North Carolina courts as well as courts in other jurisdictions overwhelmingly categorize diminution in value as a "consequential" damage. *See, e.g.*, *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 671, 464 S.E.2d 47, 62 (1995); *Stan D. Bowles Distrib. Co. v. Pabst Brewing Co.*, 69 N.C. App. 341, 350-51, 317 S.E.2d 684, 690 (1984); *Baugh Constr. Co. v. Mission Ins. Co.*, 836 F.2d 1164, 1170-71 (9th Cir. 1988); *St. Paul Fire & Marine Ins. v. N. Grain Co.*, 365 F.2d 361, 366 (8th Cir. 1966).

Furthermore, I agree with Defendants that Plaintiff has failed to show that its diminution in value was the necessary result of Sara Lee's sale of Products to third-party purchasers in the United States. As Defendants note, the alleged diminution

-17-

in value to Plaintiff's business in Israel could not occur without intervening, independent acts of third-party purchasers in the United States who allegedly re-sold some of Sara Lee's Products to entities in Israel. Even assuming those intervening acts occurred, a third-party's resale of Products to an Israeli customer would not *necessarily* diminish the value of Plaintiff's business; for example, the Israeli customer may not have otherwise purchased Products from Plaintiff.

Finally, as Defendants note, determining the diminution in the value of Plaintiff's business is inextricably linked to Plaintiff's calculation of lost profits. Since the court has already held that Paragraph 12(c) bars Plaintiff from recovering for lost profits, Plaintiff's claim for damages based on diminution in value in the newly filed complaint appears to be an attempt to get around the court's previous ruling regarding the "lost profits" bar in the Distributorship Agreements. For all these reasons, I find that Plaintiff cannot recover for diminution in value damages based on any breach of contract or tort arising out of either the 1994 or the 2004 Distributorship Agreement.[6]

---

[6] As for Plaintiff's argument that Defendants are attempting to prevent Plaintiff from recovering any damages whatsoever for Defendants' alleged breaches of the Distributorship Agreement, North Carolina courts have held that parties may limit contractually or exclude consequential damages absent unconscionability, *see Stan D. Bowles Distrib. Co.*, 69 N.C. App. at 51, 317 S.E.2d at 690, and such provisions are not prima facie unconscionable when entered into in commercial contexts, *see* N.C. GEN. STAT. § 25-2-719(3).

Plaintiff's Tort Claims for Fraud, Negligent Misrepresentation, Fraudulent Inducement, and Unfair and Deceptive Trade Practices

Next, in the motion to dismiss, Defendants contend that all of Plaintiff's tort claims should be dismissed because they merely arise out of Defendants' alleged breach of the parties' contractual obligations. It is well settled under North Carolina law that a mere breach of contract cannot sustain claims sounding in tort. *See N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs., Inc.*, No. 1:03cv911, 2005 WL 3527050, at *8 (M.D.N.C. Dec. 22, 2005) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) (finding that the district court erred "by allowing plaintiffs to advance tort and [unfair and deceptive trade practices under N.C. GEN. STAT. § 75-1.1] counts paralleling their breach of contract claims")); *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992) (holding that a mere breach of contract, even if intentional, does not give rise to an action for unfair and deceptive trade practices, absent "substantial aggravating circumstances attending the breach"). Thus, to state a non-contract claim in the context of a contractual relationship, a plaintiff must allege identifiable and distinct facts outside of the breach of contract. *N.C. Mut. Life Ins. Co.*, 2005 WL 3527050, at *8 (dismissing a negligent misrepresentation claim for failure to identify actions beyond failure to perform the contract). This rule is often referred to as the "economic loss doctrine." *See Johnson v. Sprint Solutions, Inc.*, No. 3:08-cv-54, 2008 WL 2949253, at *3 (W.D.N.C. July 29, 2008).

-19-

In support of the motion to dismiss, Defendants contend that Plaintiff's alleged tort claims cannot be sustained because they stem from Defendants' alleged "false promises" of "exclusivity and marking," which also form the basis for Plaintiff's contract claims. In other words, Defendants contend that the court should dismiss Plaintiff's non-contract claims because Plaintiff has failed to allege identifiable and distinct facts outside of the alleged breach of contract. Defendants contend that each tort claim is subject to dismissal for additional reasons as well.

Plaintiff's Claims for Fraud and Negligent Misrepresentation

First, in support of the claims for fraud and negligent misrepresentation, Plaintiff alleges that Sara Lee made fraudulent and/or negligent representations regarding Sara Lee's intent to mark Products and with regard to Sara Lee's intent to provide Plaintiff with an exclusive distributorship. Plaintiff contends that Sara Lee made material misrepresentations either without any intent of carrying out its obligation to mark Products, or with reckless disregard as to whether marking would be done, whether it could be done, and whether it would be effective. Plaintiff alleges that Sara Lee made its representations about marking and exclusivity with the intent that Plaintiff would rely on the representations, that Plaintiff justifiably relied on the representations by executing the 2004 Distributorship Agreement and the Settlement Agreement, and that Plaintiff's reliance resulted in damage to Plaintiff. Finally, Plaintiff contends that Sara Lee owed a duty of care to provide truthful and accurate information regarding the representations, in exchange for Plaintiff's

release of claims arising from or related to Sara Lee's breaches of the 1994 Distributorship Agreement. Plaintiff contends that it relied on Sara Lee's fraudulent and/or negligent misrepresentations to its detriment.

To state a claim for fraud, a plaintiff must plead with particularity facts showing (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive, (5) resulting in damage to the plaintiff. *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981). Furthermore, the tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care. *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532, 537 S.E.2d 237, 240 (2000). Significantly, to state a claim in tort for conduct that is also the basis for a party's claim against a defendant for breach of a contract, a plaintiff must allege a separate and independent duty owed by the defendant outside of the contractual relationship. *Johnson*, 2008 WL 2949253, at *3.

Here, I agree with Defendants that because Plaintiff has failed to allege some duty owed outside of Plaintiff's contractual relationship with Sara Lee, Plaintiff cannot state a claim for either fraud or negligent misrepresentation; therefore, the court should dismiss these claims. *See id.* at *4 (dismissing a negligent misrepresentation claim where it was based on the same set of facts as the plaintiff's breach of contract claim and where the plaintiff alleged no independent duty); *US LEC Commc'ns, Inc.*

-21-

*v. Qwest Commc'ns Corp.*, No. 3-05-cv-11, 2006 WL 1367383, at *2 (W.D.N.C. May 15, 2006) (dismissing fraud and negligent misrepresentation counterclaims for failure to allege a separate and independent duty outside of the contractual relationship).

To the extent, however, that Plaintiff purports to allege a claim for fraudulent inducement of the entire contracts at issue here–the 2004 Distributorship Agreement and the Settlement Agreement, the motion to dismiss that claim should be denied. *See Lithuanian Commerce Corp. Ltd. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 607-08 (D.N.J. 2002) (where a plaintiff distributor alleged that Defendant Sara Lee fraudulently induced the distributor to execute a release involving parallel imports of panty hose, and then breached the settlement agreement, denying Defendant Sara Lee's Rule 50 motion for judgment as a matter of law and allowing plaintiff to proceed to trial on both its contract and fraudulent inducement claims); *Wilson v. McAleer*, 368 F. Supp. 2d 473, 475-78 (M.D.N.C. 2005) (where the plaintiff sufficiently alleged that the defendants fraudulently induced him to enter into brokerage contracts and where the plaintiff alleged facts showing that the defendants "had a specific intent not to perform" at the time the defendants made the promise, the plaintiff stated a claim for fraudulent inducement).

I find that Plaintiff's allegations adequately plead a fraud in the inducement claim, as the complaint alleges specifically that Sara Lee fraudulently induced Plaintiff to enter into both the Settlement Agreement and the 2004 Distributorship

-22-

Agreement based on false promises of exclusivity and marking, that Plaintiff reasonably relied on these misrepresentations, and that Plaintiff was damaged by its reliance. Moreover, Plaintiff has alleged specific facts tending to show Defendant Sara Lee's lack of intent to mark Products as it had promised to do under the Settlement Agreement. For instance, Plaintiff has alleged a complete absence of internal communications at Sara Lee to determine the feasibility or cost of marking, or to develop a plan or prepare for marking Products, either before or after the execution of the Settlement Agreement, which, according to Plaintiff, "speaks volumes about Sara Lee's lack of intent to perform the marking obligations." (*See* Pl.'s. Response Br., p. 14.) I agree that Plaintiff here has "set out a scenario that, if proved, suggests the possibility of a fraudulent and deceitful scheme that extended prior to the formation of [the contracts between the parties] and continued through the execution of the contract[s]" and "[t]his is all that [Plaintiff] needs to survive a motion to dismiss."[7] *Wilson*, 368 F. Supp. 2d at 478. Therefore, the court should deny the motion to dismiss Plaintiff's claim for fraudulent inducement.

---

[7] That is, Plaintiff's fraudulent inducement claim is not merely based on its arguments that since Defendant breached the contract Defendant must not have intended to comply with the contract. Rather, like the plaintiff in *Wilson*, Plaintiff here has alleged specific facts that, if assumed to be true as they must on a motion to dismiss, do tend to show that Defendant Sara Lee never intended to mark Products as it had promised to do in exchange for Plaintiff's agreement to settle its claims arising out of the earlier 1994 Distributorship Agreement.

Plaintiff's Claim for Unfair and Deceptive Trade Practices

The court next considers Defendants' motion to dismiss Plaintiff's claim for unfair or deceptive trade practices. Section 75-1.1 of the North Carolina General Statutes, known as North Carolina's Unfair and Deceptive Trade Practices Act ("the Act") declares as unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1. The elements of a claim for unfair and deceptive trade practices are (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce, and (3) plaintiff was injured as a result. *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005). An unfair and deceptive trade practices claim does not need to be based on fraud, bad faith, or actual deception. *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 748, 600 S.E.2d 492, 500-01 (2004). "Instead, it is sufficient if a plaintiff shows that a defendant's acts possessed the tendency or capacity to mislead or created the likelihood of deception." *Id.* at 748, 600 S.E.2d at 501. Finally, a mere breach of contract, even if intentional, is not sufficient to constitute a Chapter 75 violation, absent "substantial aggravating circumstances." *Broussard*, 155 F.3d at 347.

In support of the motion to dismiss, Defendants contend that Plaintiff's unfair and deceptive trade practices claim must be dismissed for the same reason that Plaintiff's other tort claims must be dismissed–because they all arise out of the same

-24-

facts as the breach of contract claim and Plaintiff does not allege any aggravating circumstances giving rise to an unfair and deceptive trade practices claim. Defendants further contend that Plaintiff cannot bring a claim for unfair and deceptive practices because the only claimed injury is in Israel and the complaint contains no allegation that Ada Liss has in-state business operations, or in-state injury. Defendant contends that the majority view, as discussed in *The "In" Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494 (M.D.N.C. 1987), to which this court adheres, requires dismissal of Section 75-1.1 claims where claimants cannot show in-state injury to business operations in North Carolina. In other words, Defendants contend that Plaintiff's unfair and deceptive trade practices claim falls outside the limited extraterritorial reach of the Act. For the following reasons, I agree with Defendants that the majority view as announced in *The "In" Porters* bars Plaintiff from alleging a claim for unfair and deceptive trade practices. For this reason alone, the unfair and deceptive trade practices claim should be dismissed.[8]

In *The "In" Porters*, an alleged exclusive distributor of outerwear in France sued defendants Sara Lee Corporation and Hanes Printables in this court for, among

---

[8]   Because the court should dismiss the unfair and deceptive trade practices claim on the sole basis that Plaintiff's claim falls outside the limited extraterritorial reach of Chapter 75, there is no need to determine whether Plaintiff has sufficiently alleged substantial aggravating circumstances attendant to Defendants' alleged breach of contract. I do note, however, that the Fourth Circuit has observed, in analyzing North Carolina law, that a breach of contract can constitute an unfair or deceptive trade practice if the promisor enters into the contract with no intent to perform under the contract. *See Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 903 (4th Cir. 1996) ("[A] broken promise is unfair or deceptive . . . if the promisor had no intent to perform when he made the promise.").

other things, violations of Section 75-1.1, based on plaintiff's allegations that Hanes Printables' Belgian distributor was invading plaintiff's exclusive territory. *Id.* at 495-97. Sara Lee owned all of the stock in Hanes Printables, a Delaware corporation with its principal place of business in North Carolina. *Id.* at 495. Plaintiff's outerwear business was restricted to France, and it did not have any business operations in North Carolina. *Id.* at 502. Most of the negotiations, however, regarding plaintiff's exclusive distributorship with defendants had occurred in North Carolina. *Id.* at 496. Plaintiff further alleged that the Belgian distributor's attempts to take over the territory were conducted "with the full knowledge, consent and cooperation" of defendants. *Id.* at 496.

Defendants moved to dismiss the unfair and deceptive trade practices claim based on the argument that the Act lacked extraterritorial reach. The court stated that the issue before it was "whether Section 75-1.1 is available to a foreign plaintiff suing a resident defendant over alleged foreign injuries having a negligible effect, if any, on North Carolina trade or commerce." *Id.* at 501. In making this determination, the court undertook a two-part analysis, asking (1) whether the alleged facts were within the intended scope of the Act and (2) whether application of the Act would violate the United States Constitution. *Id.*

The court first analyzed North Carolina's long-arm statute and federal antitrust laws. Based on North Carolina's long-arm statute, the court first concluded that Section 75-1.1 "requires an in-state injury to plaintiff" before it can state a valid unfair

-26-

trade practices claim. *Id.* Moreover, in accord with federal antitrust laws (i.e., the Sherman Act), the court concluded that Section 75-1.1 claims are limited "to cases having a *substantial* effect on plaintiff's in-state operations." *Id.* at 502 (emphasis in original). Thus, the court held that the Act applies only if the plaintiff alleges a substantial in-state, injurious effect on its business operations in North Carolina. *Id.* at 501-02. The court next concluded that the requirement of "a substantial effect on plaintiff's in-state operations is in accord with the provisions of the United States Constitution," particularly the commerce clause and the due process clause. *Id.* at 502.

Defendants note that numerous federal courts, including this one, have followed *The "In" Porters* and have dismissed Section 75-1.1 claims in cases where the claimants failed to allege substantial injury to their own business operations in North Carolina. *See, e.g., Merck & Co., Inc. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (dismissing a Section 75-1.1 claim where the non-resident plaintiffs "failed to allege a substantial effect on any in-state business operations"); *U.S. LEC Commc'ns, Inc.*, 2006 WL 1367383, at *3 (dismissing a Section 75-1.1 counterclaim in part because the defendant failed to allege a substantial in-state injury); *In re Parmalat*, 383 F. Supp. 2d 587, 603-04 (S.D.N.Y. 2005) (adopting the "overwhelming majority" view of federal district courts and dismissing a Section 75-1.1 claim because the plaintiff did not allege a "substantial effect" on business operations in North Carolina); *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 848-51

-27-

(N.D. Ill. 2002) (reviewing federal district court cases in North Carolina and dismissing a Section 75-1.1 claim for failure to allege harm to plaintiff within North Carolina, where plaintiffs were not in North Carolina, nor did they conduct business in North Carolina); *Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 3:93-cv-301-P, 1994 WL 910955, at *2-3 (W.D.N.C. July 12, 1994) (dismissing a Section 75-1.1 counterclaim by non-resident defendants for lack of injury to in-state business operations).

In response, Plaintiff does not contest that *The "In" Porters* represents the majority view regarding Chapter 75 actions. Instead, Plaintiff cites to several cases representing the minority view in which courts have held that a plaintiff may assert a Chapter 75 claim against a North Carolina defendant arising from the *defendant's* actions occurring within the borders of North Carolina, even where the plaintiff cannot show a substantial in-state injury. S*ee, e.g., Hardee's Food Sys., Inc. v. Beardmore*, No. 5:96-cv-508-BR(2), 1997 WL 33825259, at *3 (E.D.N.C. June 6, 1997) (disagreeing with *The "In" Porters* and refusing to dismiss a non-resident's unfair and deceptive practices counterclaim).

I find that this court should adhere to the majority view as announced in *The "In" Porters*.[9] Furthermore, applying the majority view compels the conclusion that

---

[9] Plaintiff also attempts to distinguish *The "In" Porters* by contending that the foreign plaintiff in that case was complaining about misconduct that occurred only in Europe, and that there was no connection to North Carolina. On this point, Plaintiff is simply incorrect. In *The "In" Porters*, both of the named defendants, Sara Lee Corporation and Hanes Printables, were based in North Carolina, and negotiations regarding the plaintiff's

-28-

Plaintiff cannot bring an unfair and deceptive trade practices claim against Defendants. Here, Plaintiff's business is restricted to Israel, and it does not have any business operations in North Carolina. Since Plaintiff has failed to allege any in-state injury, it cannot pursue an unfair and deceptive trade practices claim against Defendants. Therefore, the court should dismiss Plaintiff's unfair and deceptive practices claim.

<u>Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

The court next considers Defendants' motion to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. The parties appear to agree that this case involves contracts governed by the UCC's Article 2. Plaintiff notes that every UCC contract "imposes an obligation of good faith in its performance." N.C. GEN. STAT. § 25-1-304. Moreover, the North Carolina Supreme Court "has recognized that '[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996) (quoting *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985)). Because the covenant of good faith and fair dealing is implied in a contract, however, a claim for breach of

_____

exclusive distributorship took place in North Carolina. The court dismissed the unfair and deceptive trade practices claim despite these connections to North Carolina because the plaintiff there, a foreign company with no business operations in North Carolina, alleged no in-state injury. Therefore, the facts of *The "In" Porters* fit squarely with the facts of this case.

-29-

that covenant typically is "part and parcel" of a claim for breach of contract.[10]  *See id.*; *see also Thomas, Lord of Shalford v. Shelley's Jewelry, Inc.*, 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000) (granting summary judgment on plaintiffs' claims for breach of contract and breach of implied covenant of good faith and fair dealing, noting that the latter was "part and parcel" of the former), *aff'd*, 18 F. App'x 147 (4th Cir. 2001).

Here, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing arises from the same allegations as its claim for express breach of contract under the 2004 Distributorship and Settlement Agreements; namely, Defendants' failure to mark Products and its failure to stop selling Products to certain third parties.  (Compl. ¶¶ 416, 418-22.)  Therefore, rather than dismissing this claim, the court will consider it simultaneously with Plaintiff's breach of contract claim.

Plaintiff's Motion for Partial Summary Judgment as to the Settlement Agreement

Next, the court considers Plaintiff's motion for partial summary judgment on the issue of whether Defendant Sara Lee breached the Settlement Agreement by failing to "mark" Products that Defendant Sara Lee sold to certain third parties, as required by the Settlement Agreement.  I first set forth the standard of review on a

---

[10]  North Carolina recognizes a separate claim for breach of an implied covenant of good faith and fair dealing only "in limited circumstances involving special relationships between parties, e.g., cases involving contracts for funeral services and insurance. Outside such circumstances, actions for breach of good faith fail."  *Mech. Indus., Inc. v. O'Brien/Atkins Assocs., P.A.*, No. 1:97cv99, 1998 U.S. Dist. LEXIS 5389, at *11 (M.D.N.C. Feb. 4, 1998) (dismissing a claim for breach of the implied covenant of good faith and fair dealing).

motion for summary judgment. Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

To prove a claim for breach of contract under North Carolina law, a plaintiff must show (1) the existence of a valid contract; and (2) breach of the terms of that

contract.  *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).  It is further well settled that a release or a settlement agreement is a contract, to be interpreted according to established rules governing contracts.  *See, e.g., Smith v. Young Moving & Storage, Inc.*, 167 N.C. App. 487, 492-93, 606 S.E.2d 173, 177 (2004); *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000).

The Settlement Agreement states, in relevant part: "To help reduce the alleged flow of parallel Bali product into Israel, Bali and its related divisions of Sara Lee Branded Apparel ("SLBA") will mark Bali product being sent to various wholesalers."  (Lissauer Dec., Ex. 12, ¶ 1.)  The Settlement Agreement further provides that Plaintiff would "use reasonable efforts to assist [Defendants] in the tracking of this product."  *Id.*  Although the Settlement Agreement does not specify the identity of the "various wholesalers" who purchase Bali Products from Defendant Sara Lee and who will receive Products that have been marked, Plaintiff contends that their identifies are easily resolved by referring to other language in the Settlement Agreement and by Defendant Sara Lee's own conduct.  The Settlement Agreement states that Defendant Sara Lee "will also have its off-price U.S. wholesalers and distributors sign an agreement which forbids them from selling competitive [SLBA] products to Israel or to third parties they know or have reason to know will sell to Israel if [Plaintiff] makes [Defendant] aware of parallel sales from that wholesaler or distributor."  (Lissauer Decl., Ex. 12, ¶ 1.)  Thus, under the parties'

-32-

Settlement Agreement, Defendant Sara Lee agreed to mark Bali Products, and, in exchange, Plaintiff released its claims against Defendant Sara Lee and was obligated to purchase Bali Products from Defendant Sara Lee.

Plaintiff contends that the evidence shows that Defendant Sara Lee knew that Atlantic Hosiery and Hosiery Street were funneling parallel imports into Israel. (*See, e.g.*, Lissauer Decl. ¶¶ 8-11, 24, and 36, & Exs. 2, 3, 11, and 18.) According to Plaintiff, Defendant Sara Lee confirmed Plaintiff's information about the parallel imports through investigations in Israel conducted by Sara Lee's own officers such as Fabien Bouquet and Shishir Babu. (*Id.* ¶¶ 41-45 & Ex. 21.) For example, well before the Settlement Agreement was executed, Bouquet specifically identified Atlantic Hosiery as a supplier of parallel imports. (*Id.* 14-21 & Ex. 6.) Furthermore, in October 2005 Babu visited Israel, and he also confirmed that Atlantic Hosiery and Hosiery Street were not only supplying the parallel imports, but that sales from those companies into Israel were even greater than Ada Liss's purchases: "He found shipments from Hosiery Street and Atlantic Hosiery outstrip regular shipments to Israel [sic]. Additionally, there [sic] selling for 30-40% cheaper than Adaliss . . . . Parallel import products are a major problem. [Ada Liss] is losing customers as a result." (*Id.* ¶ 46 & Ex. 22.) Plaintiff notes that Defendant Sara Lee's in-house counsel also confirmed that all of the Bali styles that Defendant was selling to Hosiery Street were being found in Israel. (*Id.* ¶ 36 & Ex. 18.) Furthermore, defense counsel stated in writing that Defendant Sara Lee had developed a strategy to

-33-

distinctively mark Products sold to Hosiery Street and Atlantic Hosiery. (*Id.* ¶ 38 & Ex. 19.)

Plaintiff further notes that the facts are undisputed that Defendant Sara Lee acted on the information about the parallel imports by entering into restrictive agreements with Hosiery Street and Atlantic Hosiery, which on their face prohibit these wholesalers from selling Bali Products outside the United States. (*Id.* ¶ 49 & Ex. 24.) In both agreements with Atlantic Hosiery and Hosiery Street, Defendant Sara Lee stated: "Furthermore, we intend to mark products sold to you and others, so that we can trace their origin if we find them in areas other than the United States." (*Id.*) Plaintiff notes that Defendant entered into the restrictive agreement with Hosiery Street just seven days after it executed the Settlement Agreement. (*Id.*, Exs. 12 & 14.) The restrictive agreement with Atlantic Hosiery was entered just ten days after Sara Lee's employee Babu reported to Defendant the scale of the problem of parallel imports attributable to Atlantic Hosiery. (*Id.*, Exs. 22, 24.) Plaintiff contends that the fact that Sara Lee entered into the restrictive agreements with Atlantic Hosiery and Hosiery Street shows that Defendant accepted as true the information given to it about those two wholesalers' involvement in the supply chain for parallel imports. Plaintiff contends, therefore, that the meaning of "various wholesalers" is resolved by Defendant Sara Lee's own actions towards two wholesalers who Defendant itself has confirmed were supplying the parallel importers. In sum, Defendant understood that Atlantic Hosiery and Hosiery Street

-34-

were among the various wholesalers who would have to receive distinctively marked Bali products. Plaintiff contends that Defendant Sara Lee therefore should have been marking at least Products sold to Atlantic Hosiery and Hosiery Street.

Plaintiff further contends that to the extent that Defendant Sara Lee argues that the "various wholesalers" phrase is somehow ambiguous, it is an ambiguity created by Defendant as the drafter of the Settlement Agreement. *See Quorum Health Res., LLC v. Hugh Chatham Mem'l Hosp., Inc.*, 552 F. Supp. 2d 527, 531 (M.D.N.C. 2007) (granting summary judgment on a breach of contract claim, rejecting contentions of ambiguity, noting that "ambiguous clauses in contracts are generally construed against the drafter"). Plaintiff contends, therefore, that regardless of whether any ambiguity exists in the phrase "various wholesalers," the Settlement Agreement clearly imposed upon Sara Lee the obligation to mark Bali Products in order to trace the sources of parallel imports and to stop them. Plaintiff contends that since Defendant chose not to draft the Settlement Agreement differently, it cannot now take advantage of the decision to draft the Settlement Agreement as it did.

Plaintiff further notes that after the execution of the Settlement Agreement, it is undisputed that Defendant sold Products to Atlantic Hosiery and Hosiery Street. Plaintiff contends that because of Defendant's own admissions that Defendant never marked and Defendant's failure to produce evidence of marking, it is undisputed that Defendant did not comply with the Settlement Agreement's marking obligation.

-35-

Plaintiff contends that, consequently, Defendant materially breached the Settlement Agreement, and Defendant is entitled to summary judgment on the issue of liability of the Settlement Agreement.

In response to Plaintiff's motion for partial summary judgment, Defendant Sara Lee contends that several genuine issues of material fact preclude summary judgment, including the validity and meaning of the marking language and whether Plaintiff submitted certain falsified sales invoices to Defendant, thereby excusing any breach of the marking language. Defendant Sara Lee further contends that there is a genuine issue of fact as to whether Defendant fraudulently induced Plaintiff to enter into the Settlement Agreement. Defendant contends that if Plaintiff shows fraudulent inducement, then the Settlement Agreement will be rendered void and unenforceable. Defendant contends, therefore, that the court cannot rule at this time that the Settlement Agreement is a valid contract unless Plaintiff's non-contractual claims are first dismissed.

First, as to Defendant Sara Lee's latter argument that it is premature for the court to rule on the issue of whether Defendants breached the Settlement Agreement, I note that when fraud in the inducement is found, the contract is not void but is, rather, voidable by the party who has been defrauded. *See Van Gilder v. Bullen*, 159 N.C. 291, 294, 74 S.E. 1059, 1060 (1912). Thus, the court may consider Plaintiff's contention on summary judgment that Defendant Sara Lee

breached the Settlement Agreement despite Plaintiff's alternative claim that Defendant fraudulently induced Plaintiff to enter into the Settlement Agreement.

As to Defendant Sara Lee's argument that issues of fact preclude summary judgment as to the marking issue, the court has considered both parties' arguments carefully, as well as the record on summary judgment, and finds that Plaintiff is entitled to summary judgment on the issue of whether Defendant breached the agreement to mark Products in the Settlement Agreement. The summary judgment record and undisputed facts here reveal the following: In the face of undisputed evidence that parallel imports continued to be sold in the Israeli market where Plaintiff had its exclusive distributorship, Plaintiff repeatedly requested and demanded that Defendant Sara Lee do something to stop the parallel imports. Defendant Sara Lee's own employees concluded that parallel imports were hurting Plaintiff's business and identified specific wholesalers that were engaging in the parallel imports. In exchange for Defendant Sara Lee's promise that it would mark Products sold to various wholesalers, Plaintiff agreed to give up valuable claims of damages from the time of execution of the 1994 Distributorship Agreement through execution of the 2004 Distributorship Agreement. Despite Defendant Sara Lee's promise in the 2004 Distributorship Agreement to mark Products, there is no evidence in the record that Defendant ever even attempted to mark Products.

Contrary to Defendant Sara Lee's argument, the agreement to mark was not simply an "option" under the Settlement Agreement, nor is the obligation to mark too

-37-

ambiguous to be enforced.[11]  The purpose of the marking obligation is clearly stated in the Settlement Agreement and was for reducing the "flow of parallel Bali product into Israel."  (Lissauer Dec., Ex. 12, ¶ 1.)  In connection with this purpose, Plaintiff agreed to "use reasonable efforts to assist [Defendants] in the tracking of this product."  *Id.*  Therefore, the Settlement Agreement indicates that the Products would be marked, that they would be tracked after they arrived in Israel, and that the marking would be an effective method to achieve that purpose.

The term "marking" is further explained by the restrictive agreements that Defendant Sara Lee entered into with Hosiery Street and Atlantic Hosiery, the forms of which were both sent to Plaintiff seven months before execution of the Settlement Agreement, and both of which state that sales outside the United States are prohibited and that Sara Lee "intend[ed] to mark products sold to you and others, so that we trace their origin if we find them in areas other than the United States."  (*Id.* ¶ 49 & Ex. 24.)

Defendant Sara Lee does not appear to dispute that the term "marking," at the very least, means that Defendant would implement some method of placing identifiable marks on Products sold to various wholesalers that would allow Defendant to trace the origin of the Products if they ended up being sold in Israel where Plaintiff had its exclusive distributorship.  Furthermore, Plaintiff has aptly

---

[11] As Plaintiff notes, the word "mark" is commonly defined to mean "an inscription, name, stamp, label or seal placed on an article to signify . . . origin."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 799 (1971).

demonstrated that Defendant made clear to Plaintiff that it would figure out when, where, and how the marking would take place; therefore, the fact that the Settlement Agreement does not define "marking" in more detail does not render the provision ambiguous. In other words, the fact that some terms of the marking were left unsettled and undefined does not relieve Defendant Sara Lee of its obligation to mark. Furthermore, to the extent that these terms were left undefined, the blame for that can squarely be placed on Defendant Sara Lee, the party that drafted the marking language and the party that had knowledge of the marking techniques. In sum, despite Defendants' protestations that the parties were negotiating at "arm's length" and "shared" in the drafting of the Settlement Agreement, the fact is that defense counsel drafted the provision regarding marking, and the court should be unwilling to allow Defendant Sara Lee to now attempt to avoid its contractual obligations based on its own lack of detail in drafting that provision.[12]

Furthermore, I find that to the extent that Defendant Sara Lee contends that Plaintiff's owner Lissauer falsified certain documents with regard to Atlantic Hosiery, this argument is a red herring simply presented by Defendant in an attempt to avoid the contractual obligation to mark. The simple, undisputed fact is that Defendant

---

[12] Furthermore, the fact that the Settlement Agreement did not identify each specific wholesaler that would be subject to marking does not render the marking provision too ambiguous to enforce. Suppose, for instance, that Defendant had marked Products for all but one of the companies that Plaintiff contests was introducing parallel imports. In that case, this court would have no problem concluding that Defendant had "substantially complied" with its marking obligation. It is undisputed here, however, that Defendant has not marked *a single* product to *a single* wholesaler.

-39-

Sara Lee has itself admitted, through statements by its own employees, that at some time before the Settlement Agreement was executed, Defendant Sara Lee had reason to believe that Atlantic Hosiery, Hosiery Street, and other companies were importing Bali Products into Israel and selling them at lower costs than Plaintiff Ada Liss, thus damaging Ada Liss's business. (*See* Lissauer Decl., Ex. 6; Ex. 22 (e-mail from Sara Lee employee stating that "shipments from Hosiery Street and Atlantic Hosiery out strip regular shipments to [Israel]")). To this extent, I agree with Plaintiff that Defendant Sara Lee's contention that Defendant never received reliable evidence that any of its customers were a source of parallel imports is flatly contradicted by statements of its own employees.[13] Furthermore, as noted, before execution of the Settlement Agreement, Defendant entered into restrictive agreements with both Hosiery Street and Atlantic Hosiery. These agreements clearly stated that sales outside the United States are prohibited and that Sara Lee "intend[ed] to mark products sold to you and others, so that we trace their origin if we find them in areas other than the United States." (*Id.* ¶ 49 & Ex. 24.)

---

[13]    For instance, Sara Lee's in-house counsel Christopher Fox submitted a Declaration in which he states that before the Settlement Agreement was executed, he had concluded that Atlantic Hosiery was not a source of parallel imports. Plaintiff contends that this assertion is "an outright fabrication, for this assertion is flatly refuted by Sara Lee's own internal memorandum from Fabian Bouquet to another attorney in Sara Lee's legal department." (Pl.'s Reply Br., p. 5.) Plaintiff further characterizes as false counsel Crosby's statement in his Declaration that "[b]ecause Defendants never obtained reliable information identifying one of their customers as a source of parallel imports into Israel, they were not required to mark Product." (*See* Crosby Decl. ¶ 11.)

In any event, the Settlement Agreement does not state that Plaintiff must *first* present proof of parallel imports to Defendant Sara Lee's satisfaction in order to trigger Defendant's obligation to mark. The plain language of the Settlement Agreement inherently *assumes* that there were already parallel imports and imposes on Defendant an obligation to "mark" Products in order to reduce the "flow of parallel Bali product into Israel." Indeed, as Plaintiff points out, if Defendant Sara Lee was required to mark Products *only after receiving evidence* indisputably proving that Defendant Sara Lee's customers were sources of parallel imports, then this would render the marking requirement wholly unnecessary. In other words, the very purpose of marking is to identify sources of parallel imports, and Sara Lee's own employees had *already* concluded that certain wholesalers were in fact introducing parallel Products into Israel. In the face of Lissauer's repeated entreaties to Defendant Sara Lee to do something about this serious problem, he was met with runaround after runaround and subjected to a seemingly endless loop of Defendant Sara Lee's requests for more "proof" of parallel imports and repeated empty promises to stop the parallel imports and to mark. In short, in exchange for Plaintiff's release of valuable claims, Defendant Sara Lee promised to mark certain Products; this promise was specific enough for Defendant Sara Lee to understand what that obligation entailed, and Defendant Sara Lee has admitted that it did not mark a

-41-

single Product.[14]  I, therefore, will recommend that the court grant partial summary judgment to Plaintiff on the issue of marking and hold that Defendant Sara Lee breached its marking obligation as set forth in the 2004 Settlement Agreement.[15]

**CONCLUSION**

For the reasons stated above, **IT IS RECOMMENDED** that the court **DENY** Defendants' motion to dismiss (docket no. 121) in part and **GRANT** it in part.  To this extent, the court should grant Defendants' motion to dismiss Plaintiff's claims for fraud, negligent misrepresentation, and unfair and deceptive trade practices. Furthermore, the court should treat the claim for breach of the implied covenant of good faith and fair dealing as part and parcel of Plaintiff's breach of contract claim. The court should deny Defendants' motion to dismiss Plaintiff's claim for fraudulent inducement.

Furthermore, the court should hold that Plaintiff is barred from recovering consequential damages arising out of its remaining tort claims related to the 2004 Distributorship Agreement and that Plaintiff may not recover damages based on

---

[14]  Plaintiff contends that because Defendant Sara Lee breached the Settlement Agreement, Plaintiff is no longer obligated to comply with its agreement to release claims dating back to the 1994 Distributorship Agreement, and in its refiled Complaint Plaintiff asserts breach of contract claims dating back to the 1994 Distributorship Agreement. Defendant Sara Lee does not address Plaintiff's argument that it is no longer obligated to comply with its release of claims, and the court need not rule on that issue at this time.

[15]  The court has already determined that Section 12(c) of the 2004 Distributorship Agreement excluding consequential damages does not apply to any breach of the Settlement Agreement.  Therefore, Plaintiff is not barred from recovering consequential damages incurred as a result of Defendants' breach of the 2004 Settlement Agreement.

-42-

diminution in value.  Finally, the court should **GRANT** Plaintiff's motion for partial summary judgment (docket no. 133) and find that Defendants breached the 2004 Settlement Agreement by failing to mark Products sold by Sara Lee to various wholesalers.

_____
WALLACE W. DIXON
United States Magistrate Judge

September 30, 2009