# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ADA LISS GROUP (2003) LTD,  )
formerly known as ADA LISS LTD,  )
)
Plaintiff,  )
)
v.  )     1:06CV610
)
SARA LEE CORPORATION (formerly  )
d/b/a Sara Lee Branded Apparel), and  )
HANESBRANDS, INC.,  )
)
Defendants.  )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on several motions from both parties: (i) Plaintiff's renewed motion for partial summary judgment seeking to dismiss Counts I and II of Defendants' counterclaims and finding that Defendants breached the 2004 Distributorship Agreement as a matter of law (Docket Entry 218); (ii) Defendants' motion for partial summary judgment on Defendants' counterclaim for breach of the 2004 Distributorship Agreement (Docket Entry 224); (iii) Defendants' motion for partial summary judgment on Plaintiff's claim for breach of the 2004 Distributorship Agreement (Docket Entry 226); (iv) Defendants' motion to strike certain documents and portions of declarations submitted in support of Plaintiff's renewed motion (Docket Entry 247); (v) Defendants' second motion to strike portions of declarations submitted in support of Plaintiff's renewed motion (Docket Entry 260); and (vi) Plaintiff's motion to strike portions of Defendants' summary judgment materials (Docket Entry 264). A hearing was held before this Court on May 14, 2013.

For the following reasons, the Court will grant in part and deny in part Defendants' motions to strike. The Court will also grant in part and deny in part Plaintiff's motion to strike. Furthermore, the Court will recommend that Plaintiff's renewed motion for partial summary judgment be granted in part and denied in part, Defendants' motion for partial summary judgment as to Plaintiff's claim for breach of the 2004 Distributorship Agreement be denied, and Defendants' motion for partial summary judgment as to their counterclaim for breach of the 2004 Distributorship Agreement be granted in part and denied in part.

## I. BACKGROUND[1]

In 2006, Plaintiff originally filed suit alleging various claims against Defendants arising from two distributorship agreements and a settlement agreement entered between both parties in which Plaintiff was given an exclusive distributorship agreement to sell Defendants' Bali-branded intimate apparel in Israel.[2] Plaintiff is a family-owned Israeli company that was a distributor of Defendants' Bali-brand intimate apparel in Israel. (Compl. ¶ 21; Answer ¶ 6.) The President of Plaintiff's company is Ervin Lissauer. (Compl. ¶ 22; Answer ¶ 22.) The Complaint was originally filed in Wake County Superior Court in February 2006. (Docket Entry 1-2.) The case was removed to the Eastern District of North Carolina on March 17, 2006 (Docket Entry 1), and later transferred to the Middle District of North Carolina after Defendants filed a motion to dismiss the case for improper venue or, alternatively, to transfer venue. (Docket Entry 7.)

---

[1] Due to the long history of this case, the parties and the Court are intimately familiar with the factual background. Many facts are in dispute and both parties have filed cross-motions for summary judgment. Thus, facts pertinent to each parties' legal arguments will be presented in the discussion section of this order, memorandum opinion and recommendation.

[2] Hanesbrands is a spin-off of Sara Lee and was added as a co-defendant as assignee of Sara Lee's distributorship agreements and other contracts. (*See* Docket Entry 45.)

2

Defendant Sara Lee thereafter filed an Answer to Plaintiff's Complaint. (Docket Entry 10.) Parties filed a Rule 26(f) report which the court approved (Docket Entry 16), and Defendant Sara Lee then filed a motion for judgment on the pleadings. (Docket Entry 23.) Shortly thereafter, on December 12, 2006, Plaintiff filed a motion to amend the Complaint. (Docket Entry 27.) On January 7, 2007, Plaintiff filed a motion to remand. (Docket Entry 34.) Plaintiff's motion to amend was granted, the motion to remand was denied, and Defendant's motion for judgment on the pleadings was rendered moot. (Docket Entry 45.)[3] On April 12, 2007, Defendants filed a motion to dismiss the amended complaint which was granted in part and denied in part. (*See* Docket Entries 56 and 96.) Plaintiff filed a motion for voluntary dismissal without prejudice on July 12, 2007, which the Court granted subject to several conditions. (*See* Docket Entry 105.)

On August 13, 2008, Plaintiff filed a motion to reopen the case and a new complaint was filed. The complaint alleged several claims against Defendants: (1) Count I-Breach of the 1994 Distributorship Agreement; (2) Count II-Breach of the 2004 Settlement Agreement; Count III-Breach of the 2004 Distributorship Agreement; (4) Count IV-Fraud; (5) Count IV-Negligent Misrepresentation; (6) Count VI-Unfair and Deceptive Trade Practices; and (7) Count VII-Breach of Duty of an Implied Covenant of Good Faith and Fair Dealing. (*See* Compl. filed Aug. 13, 2008, Docket Entry 107.) On October 31, 2008, Defendants filed a motion to dismiss counts IV, V, VI, and VII of the new complaint.[4]

---

[3] The district court judge adopted these rulings on May 31, 2007. (*See* Docket Entry 68.)

[4] Defendants also sought a finding from the Court that the damages exclusion provision in the Distributorship Agreements applied to all claims, thus prohibiting recovery of lost profits and damages for diminution in value of the distributorship.

(Docket Entry 121.) Plaintiff thereafter filed a motion for partial summary judgment seeking a finding that Defendants breached the 2004 Settlement Agreement. (Docket Entry 133.)

On April 28, 2010, the district court judge entered a memorandum order finding the following:

> Defendants' Motion to Dismiss [Doc. # 121] is DENIED IN PART and GRANTED IN PART. Plaintiff's stand-alone claim for breach of the implied covenant of good faith and fair dealing is coextensive with the claim for breach of contract and will not be treated as a separate claim. Pursuant to Paragraph 12(c) of the Distributorship Agreement, Plaintiff may not recover consequential damages for breach of the 2004 Agreement . . . . Defendants' Motion to Dismiss [Doc. #121] as to the claims for fraud, negligent misrepresentation, and Unfair and Deceptive Trade Practices is DENIED.

(Order at 37-38, Docket Entry 175) (footnote omitted.) The Court also granted Plaintiff's motion for partial summary judgment and found that Defendants breached the 2004 Settlement agreement by failing to mark products according to the marking provision. (*Id.* at 38.) Defendants thereafter filed an Answer and asserted counterclaims against Plaintiff. (Docket Entry 176.) On June 28, 2010, Plaintiff filed a motion to dismiss counts III and IV of Defendants' counterclaims (Docket Entry 185) and a second motion for partial summary judgment (Docket Entry 187.) In response to the second motion for partial summary judgment, Defendants contend that they were entitled to conduct more discovery and that Plaintiff's motion was brought prematurely. The court agreed, and stayed Plaintiff's second motion for partial summary judgment until additional discovery was completed. (Docket Entry 206.)

On March 29, 2011, the district court judge adopted the recommendation of the United States magistrate judge and entered an order dismissing counts III and IV of

Defendants' counterclaims.[5] On April 8, 2011, Plaintiff filed its renewed motion for partial summary judgment which is currently before the Court. (Docket Entry 218.) Defendants thereafter filed two motions for partial summary judgment on Defendants' counterclaim for breach of the 2004 Distributorship Agreement and on Plaintiff's claim for Breach of the 2004 Distributorship Agreement. (*See* Docket Entries 224 and 226.) On May 12, 2011, Defendants filed a motion to strike portions of the second and third declarations submitted in support of Plaintiff's summary judgment briefing. (Docket Entry 247.) Defendants also filed a second motion to strike portions of Scott A. Miskimon's declarations. (Docket Entry 260.) On June 30, 2011, Plaintiff filed a motion to strike portions of declarations and exhibits in connection with Defendant's summary judgment motions. (Docket Entry 264.) The case was reassigned to the undersigned on January 9, 2013. A status conference was held on February 27, 2013 to apprise the Court of the parties' pending motions. The Court thereafter set an oral argument hearing on all pending motions which was held on May 14, 2013. The undersigned took the motions under advisement after hearing oral arguments.

## II. DISCUSSION

*A. Standard of Review*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *See Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). "Facts are 'material' when they might

---

[5] The counterclaim for breach of the Playtex/Wonderbra Agreement was dismissed for lack of venue without prejudice for Defendants to bring a claim against Plaintiff in France. (*See* Docket Entry 215.)

affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson*, 477 U.S. at 250; *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995).

When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). On cross-motions for summary judgment, a review of each motion separately is necessary "to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation and citation omitted). "The court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion. *Id.* (internal quotation and citation omitted.) "The fact that both sides moved for summary judgment 'neither establish[es] the propriety of deciding a case on summary judgment, nor

6

establish[es] that there is no issue of fact requiring that summary judgment be granted to one side or another.'" *Sheridan v. Nationwide Ret. Solutions, Inc.*, 313 F. App'x 615, 616 (4th Cir. 2009) (quoting *Continental Air., Inc. v. United Air., Inc.,* 277 F.3d 499, 511 n. 7 (4th Cir. 2002).)

Upon motion for summary judgment, the court can consider all material in the record, including pleadings, stipulations, depositions, answers to interrogatories, affidavits, and admissions. Fed. R. Civ. P. 56(c). Any affidavits used in support or opposition to this motion must be made on "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A court cannot consider an affidavit lacking such personal knowledge in making a determination for motion for summary judgment. *See Antonio v. Barnes*, 464 F.2d 584, 585 (4th Cir. 1972). Rather, such affidavit "must present evidence in substantially the same form as if the affiant were testifying in court." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Furthermore, "exhibits, in the form of written documents, which are attached to an affidavit and properly authenticated, may be considered on summary judgment if the affiant is a competent witness through whom the document can be received into evidence at trial." *Grey v. Potter*, 1:00 CV 00964, 2003 WL 1923733 (M.D.N.C. Apr. 21, 2003); *see also Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir. 1993). When portions of an affidavit are inadmissible, the court may choose to strike only those portions containing inadmissible statements. *See Evans*, 80 F.3d at 962 (finding that the district court acted properly by disregarding portions of the plaintiff's affidavit that "it deemed inadmissible or improper").

*B. Motions to Strike*

   1. Defendants' First Motion to Strike

Defendants seek to strike certain documents and portions of declarations submitted in support of Plaintiff's motion for partial summary judgment. (Docket Entry 247.)

<u>2004 Fabian Bouquet Memo:</u> Defendants' motion to strike the 2004 memo from Fabian Bouquet is DENIED because the motion is untimely. Defendants assert that this document was placed on the privilege log provided to Plaintiff on May 15, 2007. (Defs.' Br. at 7 n.4, Docket Entry 248.) However, Defendants failed to object to several prior uses of the memo by Plaintiff and reliance upon the Court of such document. (*See* Third Lissauer Decl. ¶ 14, Docket Entry 135; Pl.'s Mem. Supp. Mot. for Partial Summ. J. at 3, 15, Docket Entry 136; Recomm. at 33, 40, Docket Entry 162; Fourth Lissauer Decl. ¶¶ 9, 28, 30, Docket Entry 147; Mem. Opinion of District Court at 9, 18, 21, Docket Entry 175; Pl.'s Mem. Supp. Mot. for Partial Summ. J. at 13, Docket Entry 188.) Defendants have waited approximately two and a half years to challenge Plaintiff's use of it in their motion for partial summary judgment. An untimely objection to privileged documents may result in implicit waiver of such privilege. *See F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 74 (D. Md. 1998) (Defendant's "'Johnny come lately' assertion of inadvertence is simply not enough" when the defendant knew of the memorandum's disclosure well before the objection was made); *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992) (waiver occurred after six months of failing to retrieve privileged document); *Baxter Travenol Labs., Inc. v. Abbott Labs.*, 117 F.R.D. 119, 121 (N.D. Ill. 1987) (Privilege waived after "repeated use of and reliance on the document" by Defendant without objection).

8

To the extent Defendants assert that they just learned about the disclosure of the memo during limited discovery, Defendants' argument is without merit. This document was used by Plaintiff as early as December 23, 2008, as a part of Ervin Lissauer's third declaration. (Third Lissauer Declaration at 6, Docket Entry 135.) Plaintiff's use of this document on several occasions without Defendant's objections is perplexing, and even more baffling is the failure of Defendants to object to the Court's reliance on the memo.[6] Defendants have not taken reasonable steps to maintain confidentiality. *O'Leary v. Purcell Co., Inc.*, 108 F.R.D. 641, 646 (M.D.N.C. 1985). Thus, Defendants' motion to strike the 2004 Bouquet memo is denied.[7]

Plaintiff's Summary of Mr. Babu's 2005 Trip to Israel/Phyllis Roopchan's Email: The Court will also deny Defendants' motion to strike Plaintiff's summary of Mr. Babu's 2005 trip to Israel and Phyllis Roopchan's email as untimely. Several prior uses of such documents along with prior reliance by the Court upon such documents strongly indicate that Defendants'

---

[6] The Court notes that Defendants filed objections to the Magistrate Judge's recommended ruling; however, Defendants made no specific objections to the use of the Bouquet memo. (*See* Defs.' Objection to Recommended Ruling, Docket Entry 167.) Defendants' arguments of relevancy and hearsay as to the Bouquet memo are also untimely. *See* Fed. R. Evid. 103(a)(1) (objection to evidence must be timely and on specific grounds); *see also Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived"). Furthermore, Defendants' argument that the Bouquet memo is irrelevant to Plaintiff's claim for breach of the 2004 agreement seems to be contradicted by its own statement in its Reply brief. (*See* Defs.' Reply Br. at 8, Docket Entry 262) (Defendants contend that Plaintiff was relying on information "irrelevant to its marking claim but instead *related* to its claim for breach of the Distributorship Agreement") (emphasis added).)

[7] Although the Court will consider Plaintiff's reference to the Bouquet Memo, the misquoted statement in paragraph 7 of the Eighth Declaration of Ervin Lissauer will be stricken. (*See* Eight Lissauer Decl. ¶ 7, Docket Entry 219 ("Mr. Avrahami told Mr. Bouquet that he was buying from the U.S. company Atlantic Hosiery[.]") The remaining paragraphs summarizing the Bouquet memo will remain. (*See* Eighth Lissauer Decl. ¶ 7, Docket Entry 219.)

9

waived any objections to it. Notwithstanding the timeliness of this objection, the Roopchan email meets the business record exception under Rule 803(6). *See* Fed. R. Evid. 803(6).

<u>Invoices and Packing Slips from Y & M Wholesalers:</u> The Court will deny Defendants' motion to strike the invoices and packing slips from Y & M Wholesalers. They are admissible under Federal Rule of Evidence 803(6). Admissibility under this rule requires the document to be "(1) made by a regularly conducted business activity, (2) kept in the 'regular course' of that business, (3) 'the regular practice of that business to make the memorandum,' (4) and made by a person with knowledge or from information transmitted by a person with knowledge." *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013) (internal quotations and citations omitted.) Despite Gelbert's objections, it was standard practice for Gelbart to create this document upon shipping packages to Jim Gal to clear customs and also fax a copy to Jim Gal, recipient of the shipments. Defendants' argument that the invoices lacked trustworthiness is without merit. Unlike *United States v. Price*, 516 F.3d 597, 605 (7th Cir. 2008), where it was an abuse of discretion to admit a purchase order where "the employees frequently and deliberately crammed with inaccurate information," Gelbart indicates that most of the time the quantity on the invoices reflects the quantities counted and shipped. (*See* Gelbart Dep. Ex. B at 124, Docket Entry 218.) Furthermore, Defendants did not explain how the quantities in Gelbart's invoices have some exact matches for products ordered by Hosiery Street and what Defendants delivered to Gelbart. (*See* Y&M's Invoices and Packaging Slips, Docket Entry 219-19 & Sealed Exs. 93-96, Docket Entry 221.) Thus,

absent wavier, the invoices and packing slips are admissible under the business record exception.[8]

Paragraph 9 of Miskimon's 2nd Declaration: The Court will not strike paragraph 9 of Miskimon's declaration that references an undisclosed private investigator. As previously discussed Gelbart authenticated the invoices. Therefore, any argument surrounding the undisclosed private investigator is unconvincing.

Shay Shitrit and Yitzhak Geulayev Declarations: The Court will strike the statement in paragraph 12 of Shitrit's declaration pertaining to purchases made by Mr. Geulayev and Avarhami as the facts do not indicate the Shitrit has personal knowledge of these transactions after 2002. (*See* Shitrit Decl. ¶ 12, Docket Entry 201.[9]) Defendants' objection to paragraph 8 of Shitrit's declaration is surprising considering the fact that Defendants attempted, in their motion to file a surreply, to show how this evidence deprived them of the "knowledge" Plaintiff attempts to establish for breach of the 2004 Distributorship Agreement. (*See* Defs.' Mot. Surreply at 3, Docket Entry 202.)[10] Nevertheless, paragraph 8 is admissible under Federal Rule of Evidence 803(3) to show Atlantic Hosiery's motive, intent or plan to hide its role as a supplier to parallel importers. (*See* Fed. R. Evid. 803(3).) As to the relevancy argument, Plaintiff filed Shay Shitrit's declaration to refute Defendants' argument of fabrication, thus they are relevant. (*See* Defs.' Resp. Br., at 12, Docket Entry

---

[8] The packaging slips appear to be attached to the invoice dated November 16, 2005. The invoice and packaging slip were faxed together as one document evidenced by the fax number, page count, and time of the fax. (*See* Ex. 88, Docket Entry 219-19.)

[9] Mr. Shitrit's declaration states that "Mr. Avrahami had been buying from Atlantic Hosiery from 1998 or 1999 and continued to do so until at 2007 (and may still be buying from Atlantic Hosiery)." (Shitrit Decl. ¶ 12, Docket Entry 201.)

[10] Defendants' motion to file a surreply was denied. (*See* Order, Docket Entry 204.)

245.) Also, the Court will not strike portions of Yitzhak Geulayev declarations that are relevant to Defendants' argument of fabrication. (*See* Geulayev Decl. ¶¶ 1-6, Exs. 29 & 30, Docket Entry 222.)

2. Defendants' Second Motion to Strike

In its second motion to strike, Defendants seek to strike portions of the second and third declarations of Scott A. Miskimon ("Miskimon") submitted in connection with Plaintiff's motion for partial summary judgment. (Docket Entry 260.)

<u>Miskimon's Second and Third Declarations</u>: The Court will grant in part and deny in part Defendants' motion to strike portions of Miskimon's second and third declarations. Portions of the declarations not based upon personal knowledge of Miskimon and portions of the declarations that provide legal arguments rather than summarize the evidence of record will be stricken. (*See* Fed. R. Civ. P. 56(c) (affidavits submitted in support of a motion for summary judge must be based upon personal knowledge); *Minnesota Min. & Mfg. Co. v. U. S. Rubber Co.*, 279 F.2d 409, 415 (4th Cir. 1960) (attorney's affidavit that "bolster['s] his client's case by giving factual testimony on his client's behalf . . . does not represent the testimony of one who has personal knowledge of the essential facts"). Several portions of Miskimon's declaration summarize, based upon review of the declaration, other declarations already admitted into evidence. (*See* John Jonczak Decl. ¶ 5, Docket Entry 233; Lissauer Decl. ¶¶ 17-18, 32, Docket Entry 219; Larry French Decl. ¶ 9, Docket Entry 235.) Portions of Miskimon's declarations seek to put into context other evidence already submitted by referencing those same declarations already before the Court. This provides an organizational guide for the Court as to relevant facts to consider with regard to the

12

surrounding issues in Plaintiff's pending motion for partial summary judgment before the Court. (*See Day Spring Enter., Inc. v. LMC Int'l, Inc.*, 98-CV-0658A(F), 2004 WL 2191568, at *9 (W.D.N.Y. Sept. 24, 2004) ("[g]iven the complexity of the case and the numerous documents and pages of testimony generated during discovery, the attorney's affidavits present[ed] the evidence in a cohesive fashion") (internal quotations and citations omitted); *Shell Trademark Mgmt. BV & Motiva Enter., LLC v. Ray Thomas Petroleum Co., Inc.*, 642 F. Supp. 2d 493, 510 (W.D.N.C. 2009) (declaration "does not provide or interpret that information in any way other than how the information [was] originally [presented]"); *S.E.C. v. Competitive Technologies, Inc.*, CIV.A. 304CV1331JCH, 2006 WL 3346210, at *1 (D. Conn. Nov. 6, 2006) ("attorney affidavits are acceptable when, as is largely the case here, a party uses them only as a vehicle through which to present admissible evidence relevant to the matter at hand".)

Furthermore, Miskimon has personal knowledge based upon his representation in this matter. (*See Day Spring Enter., Inc.*, 2004 WL 2191568, at *9 (W.D.N.Y. 2004) (affidavit "based on personal knowledge garnered by [counsel] during his representation of [Plaintiff] in this litigation"); *Reed v. Aetna Cas. & Sur. Co., Inc.*, 160 F.R.D. 572, 576 (N.D. Ind. 1995) ("It cannot seriously be argued that [Plaintiff's attorney] does not have personal knowledge of the discovery materials provided by [Defendant].") The Court will therefore only strike the following which purport to be legal arguments of Plaintiff's counsel:

1. Paragraph 14 of Miskimon's third declaration;

2. The portion of footnote 2 in Miskimon's second declaration stating, "There is no exception in the agreement for irregular Bali products. Therefore, it is appropriate to include Bali irregulars in the calculation of the volume of Bali bras

13

that Defendants sold to Atlantic Hosiery during the 2004 Distributorship Agreement";

3. The portions of paragraphs 12 and 14 in Miskimon's second declaration stating that there is evidence that "Hosiery Street operated as a 'pass through' for Bali product to Jim Gal in Israel"; and

4. Paragraph 15 of Miskimon's second declaration;

The Court will also strike Paragraphs 20-22 of Miskimon's second declaration discussing Defendants' use of the Limited Discovery Period. The Court finds the statements in paragraphs 20-22 to be irrelevant.

3. Plaintiff's Motion to Strike

Plaintiffs seek to strike portions of exhibits and declarations in support of Defendants' summary judgment briefs. (Pl.'s Mot. Strike, Docket Entry 264.)

June 18, 2007 Letter: The Court will deny Plaintiff's motion to strike the letter dated June 18, 2007. This letter was written by Joia Johnson and addressed to Lissauer. (*See* Docket Entry 258-1.) Plaintiff asserts that Lissauer never became aware of this letter until Defendants filed it with the Court in the reply brief to their motion for partial summary judgment on their counterclaim. However, Defendants referenced the letter in their counterclaim. (Countercl. ¶ 39, Docket Entry 176.) Plaintiff does not refute that Defendants sent the letter a few days after Plaintiff informed Defendants of its omission. (Defs.' Br. at 11, Docket Entry 269.) The letter is authenticated by distinct similarities in correspondence sent by Defendants which Plaintiff submits. (*See* Eighth Lissauer Decl., Ex. 77, Docket Entry 219-14; Sixth Lissauer Decl., Ex. 42, Docket Entry 189-3; Sixth Lissauer Decl., Ex. 43, Docket Entry 189-

14

4; *see also* Fed. R. Evid. 901(b)(4) (authentication by the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances"); *Pasquotank Action Council, Inc. v. City of Virginia Beach*, 909 F. Supp. 376, 384-85 (E.D. Va. 1995); *Royal Ins. Co. of Am. v. Crowne Invs., Inc.*, 903 So. 2d 802, 809 (Ala. 2004) ("the fact that one's letterhead is found on a document . . . is an important characteristic suggesting authenticity"); *United States v. Bello-Perez*, 977 F.2d 664, 671-72 (1st Cir. 1992); *New Orleans Saints v. Griesedieck*, 612 F. Supp. 59, 62 (E.D. La. 1985) *aff'd*, 790 F.2d 1249 (5th Cir. 1986).

<u>Jonczak's Testimony About May 2004 Letter</u>: Plaintiff seeks to strike the testimony of Jonczak regarding a May 2004 letter from Defendants to Atlantic Hosiery. Plaintiff asserts that the letter was never produced in discovery and there is no proof that the letter ever existed. Defendants use Jonczak's testimony to show that prior to entering the 2004 Settlement Agreement, Defendants had advised Atlantic Hosiery to refrain from selling products in Israel. (*See* Defs.' Reply Br., at 10, Docket Entry 259; *see also* Defs.' Br. at 18, Docket Entry 227.) Jonczak's testimony is that he "understand[s] that the same letter was sent originally in May 2004." (Jonczak's Decl. ¶ 8, Docket Entry 233.) Jonczak's testimony purports to give the proposed content of the letter, but there is nothing suggesting that he has knowledge that the letter was actually sent; he merely understands that it had been sent. Jonczak does not state who sent the letter, nor is there any evidence in the record suggesting that the recipient of the letter (Atlantic Hosiery) has any knowledge of it. The Court does not agree that Jonczak's testimony confirms that the letter was actually sent. Neither the March 2004 draft letter nor the October 2005 restrictive letter agreement is the "best

15

evidence" as to the contents of the May 2004 Letter. (*See* Fed. R. Evid. 1002; Fed. R. Evid. 1004.) Jonczak does not even confirm that the October 2005 restrictive letter agreement is the same, or substantially the same, as the March 2004 draft letter or the May 2004 letter. Thus, the Court will strike Jonczak's testimony concerning the May 2004 letter.

Testimony of Shishir Babu, Phyllis Roopchan, Joseph Baum, Larry French, Jack Sutton: Plaintiff seeks to strike portions of the declarations of Shishir Babu ("Babu"), Phyllis Roopchan, Joseph Baum, Larry French, and Jack Sutton by primarily asserting that such testimony contradicts Defendants' own records and documents that are a part of the evidence presently before the Court. (*See* Pl.'s Br. at 10-16, Docket Entry 265.) Defendants assert that there is no conflicting testimony and that Plaintiff's motion is "dedicated to weighing what it contends is competing evidence" to what Plaintiff has presented in this matter. (*See* Defs.' Resp. Br. at 3-5, Docket Entry 269.) Plaintiff relies on the holding in *Brasco, Inc. v. Int'l Graphic Servs., Inc.*, 602 F. Supp. 129, 135 (N.D. Ill. 1984), where the court in granting summary judgment on plaintiff's breach of contract claim stated that "a court is not obligated to credit a litigant's statement . . . that flies so squarely in the teeth of the litigant's own prior unequivocal statements and conduct." Even in that case, as Defendants assert, the court did not strike the affidavit statement, but concluded that it was insufficient to support Defendant's counter-assertion. (*Id.* at 131-32.) In the current matter, the Court here will not make credibility determinations. (*See In re French*, 499 F.3d 345, 354 (4th Cir. 2007) ("In the summary judgment context, a court is simply not empowered to make [credibility] determinations"); *Brooks v. Motsenbocker Advanced Developments, Inc.*, 242 F. App'x 889, 890 (4th Cir. 2007) ("summary disposition should not be made based on conflicting

16

affidavits"); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (entry of summary judgment vacated after court determined "the affidavits present[ed] conflicting versions of the facts which require[d] credibility determinations.") Thus, to the extent Plaintiff asserts that portions of the declarations contradict pre-litigation documents (*see* Pl.'s Br. at 10-16, Docket Entry 265), the court will deny Plaintiff's motion.

Plaintiff also asserts that the Court should strike some portions of these declarations because they are inadmissible hearsay. The Court will strike statements in paragraphs 11 and 15 of Babu's declaration and paragraph 8 of Jack Sutton's declaration which Defendants submitted to show alternate explanations for parallel imports. (*See* Babu Decl. ¶¶ 11, 15, Docket Entry 232; Sutton Decl. ¶ 8, Docket Entry 234.[11]) These statements are irrelevant to whether Defendants knew or had reason to believe that its customers were conduits for parallel imports.

## C. Plaintiff's Motion for Partial Summary Judgment as to Count I of Defendants' Counterclaim

Plaintiff contends that summary judgment should be granted as to Defendant's counterclaim for breach of the 2004 Settlement Agreement because: (1) Defendants' waived this argument by not raising it in opposing Plaintiff's summary judgment motion as to liability on the same agreement; (2) any claims arising from events prior to May 12, 2006, are barred by the statute of limitations; and (3) Defendants' breach of the "marking" provision

---

[11] Paragraph 11 of Babu's declaration states, "I visited two department stores with Mr. Lissauer and discussed with him that Ada Liss was not sufficiently advertising . . . Representatives at the department stores clearly were upset with Ada Liss's lack of advertising." Paragraph 15 states, "I suggested that he reduce his very high prices and flood the market . . . I believe that Mr. Lissauer could have dropped his prices significantly and still made sizeable profits." Paragraph 8 of Sutton's declaration states, "If Mr. Lissauer had reduced his profit margins as I, and others at Sara Lee, suggested, he may not have had the problems alleged in this lawsuit."

excused Plaintiff from further performance. (*See* Pl.'s Br. at 6-12, Docket Entry 223.) Defendants contend otherwise, asserting that no waiver has occurred, that the statute of limitations does not bar any portion of Defendants' claim, and that Plaintiff's failure to perform an independent promise is not excused as a result of Defendants' breach. (*See* Defs.' Br. at 19-26, Docket Entry 245.) Based upon the evidence presented, the Court recommends that summary judgment be granted in favor of Plaintiff because there is no genuine issue of material fact as to Plaintiff's breach of the 2004 Settlement Agreement.

Provision three of the 2004 Settlement Agreement states:

> For the Sara Lee fiscal year 2005, (July 1, 2004 thru June 30, 2005) Ada Liss agrees to purchase US $300,000.00 in first quality US SLBA list price product without impact on SLB Europe volumes. Sara Lee will offer Ada Liss an additional 5% discount on top of the discount structure (except for Playtex) attached as Schedule I to the Distributor Agreement through Sara Lee fiscal year 2007. During Sara Lee fiscal years 2006 and 2007, Ada Liss will grow this minimum $300,000.00 first quality number by 20% per year.

(2004 Settlement Agreement, Ex. 12 at 3, Docket Entry 227-2.) Count I of Defendants' counterclaim asserts that Plaintiff breached this provision of the 2004 Settlement Agreement by failing to purchase "US $300,000.00 in first quality US SLBA list price product during Sara Lee fiscal year 2005," failing to grow its "minimum first quality number by 20% per year during Sara Lee fiscal years 2006 and 2007," and failing to make minimum purchases in the years 2005-2007. (Countercl. ¶¶ 18-19, 87-90, Docket Entry 176.) In its motion for summary judgment, Plaintiff asserts that Defendants' counterclaim is "procedurally defective" because Defendants have waived the claim by not raising the purported breach in the opposition brief to Plaintiff's motion for summary judgment as to the 2004 Settlement agreement. (*See* Pl.'s Opp. Br. at 10-11, Docket Entry 223.) Plaintiff contends that Rule

18

12(h)(2) allows for defense of failure to state a claim any time before disposition on the merits, and after such time any defense has been waived. (*See* Fed. R. Civ. P. 12(h)(2); *see also Snead v. Department of Social Servs.*, 409 F. Supp. 995, 1000 (S.D.N.Y. 1975), *vacated on other grounds,* 425 U.S. 457, 96 S. Ct. 1630, 48 L. Ed.2d 88 (1976); *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 871 (4th Cir. 1999).) However, as Defendants have pointed out, both of those cases are distinguishable from the facts and circumstances before us, particularly in light of the uncommon procedural posture of this case.

In *Snead,* waiver of the defense of lack of jurisdiction occurred when the defendants did not raise the issue for the first time until after adjudication on the merits of the case in plaintiff's favor, and after being appealed to the Supreme Court, and vacated and remanded twice. (*See Snead,* 409 F. Supp. at 997-1000.) In *Eberhardt,* a Rule 60(b) motion was construed as a Rule 12(b)(6) motion that had been waived since "there is no authority for such a motion to be brought after trial." (*Eberhardt,* 167 F.3d at 870.) Unlike these cases, the Court finds that Defendants did not waive their counterclaim as to breach of the 2004 Settlement agreement. Plaintiff's earlier motion for summary judgment as to Defendants' breach of the 2004 Settlement Agreement addressed the "marking" provision of the agreement, particularly Defendants' duty to mark certain products sold to third parties in an effort to track the marked products. (Pl.'s Br. at 13-20, Docket Entry 136.) The Court found no evidence in the record showing that Defendants attempted to mark products; thus Plaintiff was entitled to summary judgment on the issue of whether Defendants breached the agreement to mark products in the Settlement Agreement. (Recomm. at 37, Docket

19

Entry 162; adopted by reference in Memorandum Opinion of U.S. District Judge, Docket
Entry 175 at 36-37.)

In the memorandum opinion and parties' briefs, neither the parties nor the Court
addressed any other provisions of the 2004 Settlement Agreement as the "marking" issue
was the only provision before the Court. (*See generally* Pl.'s Br. 13-21, Docket Entry 136;
Defs.' Opp. Br. at 2 n. 2, Docket Entry 141; Recomm. at 30-43, Docket Entry 162.) To
suggest that Defendants' counterclaim as to a different provision is now waived would be
seemingly unfair, particularly in light of the fact that Plaintiff's complaint also alleges other
breaches of the 2004 Settlement Agreement that did not appear before the Court in
Plaintiff's prior motion for summary judgment as to the marking provision. (*See* Am.
Compl. ¶¶ 349-352.) As such, after the Court ruled that Defendants breached the 2004
Settlement Agreement by failing to mark products, both parties still had claims for breach of
the same agreement pending in this case. Furthermore, the Court, "in an abundance of
caution," stayed Plaintiff's second motion for partial summary judgment to allow the parties
to conduct additional discovery before ruling on the pending motions before it. (*See* Order,
Docket Entry 205 at 4.) It clearly appears that Plaintiff's intention in the previous partial
summary judgment motion was to address the single issue of "marking" as to the 2004
Settlement Agreement and nothing more. Thus, the Court concludes that Defendants'
choice not to couch their counterclaim as an affirmative defense is not a waiver of such
claim.

Plaintiff also contends that summary judgment should be granted as to Defendants'
counterclaim for breach of the 2004 Settlement Agreement because Defendants' breach of

20

the "marking" provision excused Plaintiff from further performance. (*See* Pl.'s Br. at 6-12, Docket Entry 223.) As previously stated, the Court has already determined that Defendants breached the 2004 Settlement Agreement as a matter of law by failing to mark Bali products. (*See* District Court's Mem. Op. Order at 37, Docket Entry 175 (adopting by reference Recomm. at 30-34, Docket Entry 162).) Defendants assert, however, that Plaintiff's obligation to perform minimum purchases of Bali products under the 2004 Settlement Agreement was an independent promise not conditioned upon the marking provision, thus Plaintiff's nonperformance was not excused. (*See* Defs.' Br. at 19-21, Docket Entry 245.) The Court finds Defendants' argument without merit.

Under North Carolina law, when one party materially breaches a bilateral contract, the non-breaching party is excused from further performance. *McClure Lumber Co. v. Helmsman Const., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003); *Coleman v. Shirlen*, 53 N.C.App. 573, 577–78, 281 S.E.2d 431, 434 (1981); *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 537, 551 S.E.2d 546, 555 (2001). The exception to this rule, however, is that "[f]ailure to perform an independent promise does not excuse nonperformance on the part of the other party." *Coleman,* 53 N.C. App. at 578, 281 S.E.2d at 434. To distinguish between independent and dependent promises, the North Carolina Supreme Court states:

> Whether covenants are dependent or independent, and whether they are concurrent on the one hand or precedent and subsequent on the other, depends entirely upon the intention of the parties shown by the entire contract as construed in the light of the circumstances of the case, the nature of the contract, the relation of the parties thereto, and other evidence which is admissible to aid the court in determining the intention of the parties.

*Williams v. Habul*, 724 S.E.2d 104, 112-13 (N.C. Ct. App. 2012) (citing *Harris & Harris Const. v. Crain & Denbo, Inc.*, 256 N.C. 110, 117, 123 S.E.2d 590, 595 (1962) (internal quotations

omitted); *see also Wade v. Lutterloh*, 196 N.C. 116, 144 S.E. 694, 696 (1928). "[F]or a contract provision to be construed as a condition precedent, the provision must contain language which plainly requires such construction." *McClure*, 160 N.C. App. at 197, 585 S.E.2d at 238. Clear indication of condition precedent language includes "the use of such words as 'when,' 'after,' 'as soon as' and the like." *Id.* (citation omitted.)

On its face, the two provisions of the 2004 Settlement Agreement lack conditional language to suggest that they were dependent upon one another. The marking provision states, in part, "To help reduce the alleged flow of parallel Bali product into Israel, Bali and its related divisions of Sara Lee Branded Apparel ("SLBA") will mark Bali product being sent to various wholesalers . . . ." (2004 Settlement Agreement, Ex. 12 at 2, Docket Entry 227-2.) The third provision in the agreement regarding the purchase of minimum quantities and the discount structure does not reference Defendants' obligations as to the marking provision. Although there is lack of conditional language, the plain language of the two provisions in the agreement, along with the parties' intent, and nature of the circumstances surrounding the Settlement Agreement indicate that these promises were mutually dependent upon one another such that Defendants' breach of the marking provision would excuse further performance by Plaintiff as to its obligations under paragraph 3.[12] In paragraph 1 Defendants agreed to mark certain products being sent to various wholesalers in an effort to help reduce the alleged flow of products into Israel. Paragraph 3 obligates Plaintiff to

[12] *But see Habul*, 724 S.E.2d at 113 (there was no nexus between promise to dismiss and an additional promise to employ "to permit construction of the promises in these separate provisions as mutually dependent.")

minimum purchases and also obligates Defendants to offer Plaintiff a certain discount structure on Bali products. The provisions are relative in nature such that Plaintiff's ability to maintain minimum quantities was in direct relation to Defendants' duty to mark Bali products to reduce the unwarranted flow of products into Israel.

The parties entered into the 2004 Settlement Agreement as a way to resolve any allegations as to violations of the exclusivity provision in the 2004 Distributorship Agreement. Both provisions at hand dealt directly with Bali products. As such, to avoid common sense application, as Defendants would have us to do, would be contravening to the intent of the parties when entering into the agreement.[13] The Court therefore concludes that summary judgment should be granted in favor of Plaintiff as to Defendants' counterclaim for breach of the 2004 Settlement Agreement.[14]

## D. Cross-motions for Partial Summary Judgment as to Defendants' Breach of the 2004 Distributorship Agreement.

Both sides have moved for summary judgment as to Plaintiff's claim that Defendants breached the 2004 Distributorship Agreement. (*See* Docket Entries 218 and 226.) In its motion, Plaintiff contends that the Court should find that there is no genuine issue of material fact as to whether Defendants breached the 2004 Distributorship Agreement, particularly the exclusivity provision in which Plaintiff was granted the right to be sole distributor of Bali-branded intimate apparel products in the territory of Israel. (*See* Pl.'s Br.

---

[13] *See generally* 14 Williston on Contracts § 43:1 (4th ed.) ("[I]n case of doubt, the court will presume that the promises are dependent rather than independent, since such a construction ordinarily prevents one party from having the benefit of the contract without performing his or her own obligation.")

[14] The Court concludes that Plaintiff's nonperformance was excused; thus, it will not address Plaintiff's statute of limitations argument.

23

at 12-13, Docket Entry 223.) Plaintiff claims that Defendants had *reason to believe* their customers, Atlantic Hosiery and Hosiery Street, were sources of parallel imports. (*Id.*) Defendants oppose Plaintiff's motion, arguing that there is no evidence that a breach of the 2004 Distributorship Agreement occurred on their behalf because Plaintiff has not shown that: (1) Defendants sold products to Atlantic Hosiery during the term of the agreement; and (2) Atlantic Hosiery of Hosiery Street sold products to Israel during the term of the agreement. (*See* Defs.' Br. at 8-10, 14-19, Docket Entry 245.) Defendants also assert that Plaintiff's primary evidence of a breach is inadmissible and irrelevant to the current issue before the Court. (*Id.* at 10-14.)

To establish liability for a breach of contract claim under North Carolina law, there must be (1) an existing valid contract and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Neither party here disputes that a valid contract existed. Under the terms of the agreement, Defendants granted Plaintiff a distributorship appointment for a stated term and in turn, Plaintiff agreed to distribute Defendants' products for the stated term in the territory of Israel. (*See generally* Distributorship Agreement, Docket Entry 227-1.)[15] Both parties signed the agreement. The parties' dispute lies not in the validity of the agreement, but rather as to whether a breach of the 2004 Distributorship Agreement occurred. Paragraph 2(b) of the distributorship agreement states in part:

> The rights granted to DISTRIBUTOR herein are exclusive solely in that neither SLBA nor any of its Affiliates will, during the term of this Agreement, sell the Products to anyone in the Territory other than the DISTRIBUTOR, nor will SLBA (or such Affiliates) sell the Products to anyone whom SLBA (or

---

[15] There are other specific terms in the agreement.

such Affiliates) *knows or has reason to believe* is likely to resell or deliver the Products to customers located in the Territory . . . Except as otherwise provided herein, neither SLBA nor any of its Affiliates shall in any way be liable to DISTRIBUTOR should independent third parties sell or supply any Products or other products, whether or not intimate apparel, under the SLBA Trademarks name to others in the Territory. Nothing herein shall restrict the right of SLBA and its Affiliates to sell woman's intimate apparel other than the Products to any third parties in the Territory.

(Distributorship Agreement, ¶ 2 (b), Docket Entry 227-1) (emphasis added).

Plaintiff first points out that the Court previously determined that Defendants had reason to believe their customers were sources for parallel imports:

The simple, undisputed fact is that Defendant Sara Lee had itself admitted through statements by its own employees, that at some time before the Settlement Agreement was executed, Defendant Sara Lee had reason to believe that Atlantic Hosiery, Hosiery Street, and other companies were importing Bali products into Israel and selling them at lower costs than Plaintiff Ada Liss, thus damaging Ada Liss's business.

(Recomm. at 39-30, Docket Entry 162 (adopted in District Court's Mem. Op. Order at 37, Docket Entry 175.)) At the time of this holding, Plaintiff's claim for breach of the 2004 Distributorship Agreement was not before the Court. The Court was specifically addressing breach of the "marking" provision in the 2004 Settlement Agreement, thus Defendants contend that the Court's holding related to the "marking" provision of the Settlement Agreement did not establish their liability under another agreement, the 2004 Distributorship Agreement. (*See* Defs.' Br. at 6-7, Docket Entry 245.) While recognizing the Court's statement in the District Judge's order, the Court will, in an abundance of caution, and in the

25

interest of justice, consider the cross-motions now pending before the Court based upon the evidence in the record.[16]

The core of both Plaintiff and Defendants' cross-motions for summary judgment as to Plaintiff's claim for breach of the 2004 Distributorship Agreement stems from the issue of whether Defendants knew or had reason to believe that their customers, Atlantic Hosiery and Hosiery Street, were likely to resell or deliver products to customers in Plaintiff's exclusive territory in Israel. With regard to Defendants' knowledge that Atlantic Hosiery made sales into Israel, Plaintiff supports its argument by first asserting that Defendants entered into the 2004 Distributorship Agreement with knowledge that Atlantic Hosiery, one of Defendants' customers, was supplying parallel imports. (*See* Pl.'s Br. at 14, Docket Entry 223.) Atlantic Hosiery's president/owner confirmed that it had been buying its Bali-branded intimate apparel garments from Defendant Hanesbrands.[17] (*See* Kloda Dep. at 47-48, 59-62, Docket Entry 133-2.)

An interoffice memorandum by one of Defendants' executives, Fabian Bouquet, indicates that in February 2004 (before the parties entered into the 2004 Distributorship Agreement) he visited Israel to investigate Plaintiff's complaints about parallel imports. (*See* Bouquet Memo, Ex. 6, Docket Entry 219-2.) The memo indicates that Bali branded products are the most affected products. (*Id.*) The memo also indicates that Mr. Bouquet

---

[16] At the time of the District Judge's memorandum order, discovery was not completed. The Court stayed Plaintiff's renewed motion for judgment to allow the parties to conduct limited discovery of relevant matters now before the Court. (*See* Order, Docket Entry 206.) To now conclude summary judgment in favor of Plaintiff based solely on the District Court's conclusion regarding a separate matter would be unfair and would render the delay in ruling on the Plaintiff's motions pointless.

[17] Hanesbrands, Sara Lee's spin-off (both of whom are named Defendants in this action), also admits to selling Bali products to both Atlantic Hosiery and Hosiery Street after the 2004 Distributorship Agreement was assigned to it. (*See* Answer ¶¶ 315, 317, Docket Entry 176.)

met Mr. Avrahami, owner of Sera Lingerie, who indicated that he purchased Bali products frequently. (*Id.*) Mr. Avrahami does not indicate who he purchased them from. The memo further indicates that Atlantic Hosiery directly supplied other stores in the region. (*Id.*) Atlantic Hosiery's presidents, Kloda and Daniel Whitebrook, testified that the company never sold products to Israel. (Kloda Dep. at 15-21, Docket Entry 227-4; Second Kloda Decl. ¶6,[18] Docket Entry 229; Second Whitebook Decl. ¶6, Docket Entry 230.) Plaintiff also submits the declarations of Shitrit (co-owner of Levanvanim) and Geulayev who attested to their purchases of Bali products from Atlantic Hosiery prior to the 2004 Distributorship Agreement. (*See* Shitrit Decl. ¶¶4-11, 13-17 & Ex.41, Docket Entry 201; Geulayev Decl. ¶¶1-8 & Exs. 29-30, Docket Entry 222.)

After the parties entered the 2004 Distributorship Agreement, Defendants' vice president, Babu, conducted another investigation of parallel imports in Israel during October 2005 after more reported concerns of parallel imports. (*See* Ex. 20, Docket Entry 219-9.) According to an email by Phyllis Roopchan, an employee of Defendants, Babu, "found shipments from Hosiery Street and Atlantic out strip regular shipments to Israel" and that "[sic] selling for 30-40% cheaper than Ada Liss." (*See* Roophan Email, Ex. 22, Docket Entry 219-11.) In his declaration, however, Babu indicates that Ms. Roopchan misunderstood him, and instead Mr. Babu was reporting on what Lissauer represented to him. (*See* Babu Decl. ¶ 17, Docket Entry 232.) Plaintiff's summary of Babu's trip in October 2005 indicates how Defendants were visually exposed to parallel imports in Israel. (Summary of Babu Trip, Docket Entry 219-10.) Plaintiff also contends that the undisputed facts as to quantities

---

[18] Kloda does state that he supplied shipments to Israel with permission from Defendant Sara Lee before 2002. (*Id.*)

purchased by Atlantic Hosiery at discounted prices support the conclusion that parallel imports originated with Defendants' customer. A summary of unredacted invoices from Defendants to Atlantic Hosiery indicates that the quantity of Bali bras purchased during the first week of the term of the 2004 Distributorship Agreement was nearly double the amount that Plaintiff purchased from Defendants in the years 2005 and 2006.[19] (*See* Second Miskimon Decl. ¶ 7, Docket Entry 261-1; Sealed Ex. 90, Docket Entry 221-1; Sealed Ex. 91, Docket Entry 221-2.) Over the term of the entire 2004 Distributorship Agreement, Atlantic Hosiery purchased over 400,000 Bali bras, some of which were irregulars. (Sealed Ex. 89, Docket Entry 221; Second Miskimon Decl. ¶ 6, Docket Entry 261-1.)

On cross motion, Defendants argue that that the exclusivity provision was limited to first-quality Bali women's intimate apparel, which does not include irregulars and closeouts, thus Defendants could not have been in breach of the agreement by selling to Atlantic Hosiery. (*See* Defs.' Br. at 8-10, Docket Entry 245.) Testimonies of presidents of Atlantic Hosiery indicate that the company only purchased non-first quality goods, such as closeouts and irregulars at discounted prices. (*See* Kloda Dep. at 15, 52, Docket Entry 227-4; First Whitebook Decl. ¶ 4, Docket Entry 197-8; Second Kloda Decl. ¶ 4, Docket Entry 229; Second Whitebook Decl. ¶ 4, Docket Entry 230.) Plaintiff's president, Lissauer, admits to not having a right to closeouts under the agreement. (*See* Lissauer Dep. at 84-91, Docket Entry 227-3.) In their motion for summary judgment on the same claim, Defendants further

---

[19] Defendants also argue that certain invoices provided by Plaintiff as proof of Atlantic Hosiery Street's involvement were fabricated by Lissauer. (First Kloda Decl. ¶¶ 13-14, Docket Entry 197-7.) The Court previously concluded that Defendants' fabrication argument was a red herring. (Recomm. at 39, Docket Entry 162.) Plaintiff further submits evidence that Defendants' fabrication argument is without merit. (*See* Geulayev Decl. ¶¶ 1-6, Exs. 29 & 30, Docket Entry 222; Shitrit Decl. ¶ 30, Docket Entry 201.)

argue that there would be no need for Lissauer to negotiate for non-first quality products under the 2004 Settlement Agreement if the right to sell these items already existed under either of the Distributorship Agreements. (*See* Defs.' Br. at 8-9, Docket Entry 227; *see also* 2004 Settlement Agreement, (2004 Settlement Agreement, ¶ 2, Docket Entry 227-2.) However, Plaintiff asserts that if the 2004 Distributorship Agreement did not include close-outs and irregulars, Defendants would have informed Plaintiff of that fact, would not have investigated sales, would not have agreed to mark products to wholesalers such as Atlantic Hosiery, and would not have signed a written agreement with Atlantic Hosiery prohibiting them from re-selling products in Israel.

The Court first notes that it "[f]aces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." (*Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. R.T.C.*, 7 F.3d 1123, 1126 (4th Cir.1993).) The Court must determine if the language of the contract is ambiguous or unambiguous. "If the agreement is ambiguous . . . interpretation of the contract is a matter for the jury." *Quorum Health Res., LLC v. Hugh Chatham Mem'l Hosp., Inc.*, 552 F. Supp. 2d 527, 530 (M.D.N.C. 2007) (citing *Dockery v. Quality Plastic Custom Molding, Inc.,* 144 N.C. App. 419, 421-22, 547 S.E.2d 850, 852 (2001).) A difference of opinion as to a term of a contract is "[s]ome indication that the language of the contract is, at best, ambiguous." *St. Paul Fire & Marine Ins. Co. v. Freeman-White Associates, Inc.*, 322 N.C. 77, 83, 366 S.E.2d 480, 484 (1988). "[W]hen an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter—the party responsible for choosing the questionable language." *Novacare Orthotics & Prosthetics E., Inc. v.*

29

*Speelman*, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000). Here, Defendants drafted the 2004 Distributorship Agreement. (Ninth Lissauer Decl. ¶ 4, Docket Entry 241.)

The Court concludes that the defined term "Products" in the 2004 Distributorship Agreement is unambiguous, precluding the need to examine extrinsic evidence to determine the intent of the parties. Paragraph 1(i) of the agreement, drafted by Defendants, defines products: "'Products' shall mean the "BALI"-branded intimate apparel garments . . . Products shall also mean, on a non-exclusive basis only, Playtex, Wonderbra, Barely There and Hanes Her Way, and any other additional products mutually agreed upon by the parties in writing from time to time." (Distributorship Agreement, Ex. A ¶ 1(i), Document Entry 227-1.) There is nothing ambiguous about this language. "Where a [contract] defines a term, that definition is to be used." *Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000) (quoting *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505–06, 246 S.E.2d 773, 777 (1978).) Here, Defendants defined the term "Products" to mean: (1) Bali-branded intimate apparel and (2) "on a non-exclusive basis only, Playtex, Wonderbra, Barely There and Hanes Her Way . . .". (Distributorship Agreement, Ex. A ¶ 1(i), Document Entry 227-1.) This definition is clear and unambiguous. The fact that there was an exclusivity provision in the contract suggests that if Defendants intended to attach additional limitations to Bali-branded intimate apparel, they would have expressed it in the agreement. The Court concludes that the term "Products" is unambiguous, thus there is no need to examine extrinsic evidence to determine the intent of the parties. (*See Nesbit v. Cribbs*, 203 N.C. App. 149, 692 S.E.2d 194 (2010) (unpublished

30

opinion) (no review of records for circumstances surrounding the making of the Agreement because contract term unambiguous).

Plaintiff also offers evidence to show Defendants' knowledge of Hosiery Street's sales into Israel. Prior to entering the 2004 Distributorship Agreement, Plaintiff complained to Defendants about parallel imports of Bali products by Henia Gelbart through Hosiery Street. (Eighth Lissauer Decl. ¶ 3, Docket Entry 219; Ex. 32, Docket Entry 219-13; Babu Decl. ¶ 10, Docket Entry 232.). Henia Gelbart's sister-in-law Mela Gelbart is married to Mayer Gelbart. (*See* Eighth Lissauer Decl. ¶ 13, Docket Entry 219; Ex. 84, Docket Entry 219-15; Gelbart Dep. at 14, 36-39, Docket Entry 218-2.)[20] Henia Gelbart runs the company Jim Gal. (Gelbart Dep. at 38-39, Docket Entry 218-2.) Plaintiff notified Defendants in October 2004 that Hosiery Street was sending products through Mayer Gelbart who would then supply them to Henia Gelbart's operating company, Jim Gal. (Ex. 11, Docket Entry 219-3.) Defendants' investigation of Hosiery Street, including questioning the company's executive and analyzing the Bali quantities and styles resulted in Defendants' conclusion that there was no evidence of parallel imports into Israel. (Babu Decl. ¶ 10, Docket Entry 232; Joseph Baum Decl. ¶ 6, Docket Entry 231.) Joseph Baum, owner of Hosiery Street, testified that he purchased Bali products at regular list price and sold them in the United States. (Baum Dep. at 32-36, 47-50, 112-114, Docket Entry 227-7; Joseph Baum Decl. ¶ 5, Docket Entry 231.) On November 16, 2004, Baum signed an agreement with Defendants that prohibited Hosiery Street from selling outside the United States. (Joseph Baum Decl. ¶ 7, Docket Entry 231.)

---

[20] Mayer Gelbart is close friends with the owner of Hosiery Street, Joseph Baum. (Gelbart Dep. at 14, Docket Entry 218-2.)

Defendants continued to supply products to Hosiery Street and Plaintiff again notified Defendants of Hosiery Street's actions in March and May of 2005. (*See* Eighth Lissauer Decl. ¶¶ 16-17, Docket Entry 219; Ex. 85, Docket Entry 219-16; Ex. 86, Docket Entry 219-17.) Grady Crosby, Defendants' in-house counsel, sent an email to Plaintiff in July 2005 where he stated that Plaintiff had "identified Hosiery Street as a potential supplier to Gym Gal." (*See* Ex. 18, Docket Entry 219-7.) Grady also lists certain brands and styles of intimate apparel and seeks to confirm this with the allegations from Plaintiff. (*Id.*) An email, which Babu contests, recapping the summary of Babu's trip to Israel in 2005 indicates that Hosiery Street's shipments "out strip regular shipments to Israel." (*See* Ex. 22, Docket Entry 219-11.)

To further support its argument, Plaintiff contends that the invoices from Mr. Gelbart to Jim Gal in Israel further solidify Defendants' knowledge of Hosiery Street's involvement as a conduit of parallel imports. The Y & M invoices show Mr. Gelbart's company shipping products to Jim Gal in Israel in September and November of 2005. (*See* Invoices & Packing Slips, Ex. 88, Docket Entry 219-19.) Prior to Mr. Gelbart's shipments to Jim Gal, Defendants' invoices indicate that they sold products to Hosiery Street and delivered them directly to an address in Brooklyn belong to Mr. Gelbart. (*See* Sealed Exs. 93-96, Docket Entry 221.) Defendants contend that they did not become aware of the Y & M invoices until Mr. Gelbart's deposition in December 2006 and moreover, this line of evidence merely shows transactions only between Mr. Gelbart (Y&M) and Jim Gal, but does not show that their customer, Hosiery Street, sold products to a customer in Israel. (*See* Defs.' Resp. Br. at 13-14, Docket Entry 245.) Lissauer admits that Plaintiff has no

32

documents showing sales from Hosiery Street to customers in Israel. (Lissauer Dep. at 172, Docket Entry 245-1.) Throughout the years, Defendants continued to evaluate the complaints of Plaintiff and found no evidence that Atlantic Hosiery or Hosiery Street were exporting Bali products to Israel. (Ritz Decl. ¶ 8, Docket Entry 228; Babu Decl. ¶ 10, Docket Entry 232.) After Mr. Gelbart's deposition which took place in December 2006, Defendants sent him a letter indicating that they just became aware of Mr. Gelbart's shipments to Israel and urging him to stop distributing Bali products in the Territory. (*See* Ex. 77, Docket Entry 219-14.)

A review of the record indicates that there is a genuine issue of material fact as to whether Defendants knew or had reason to believe that two of its customers, Atlantic Hosiery and Hosiery Street, were sources of parallel imports in Israel. Plaintiff's evidence seeks to establish that Defendants' customers were sources of parallel imports in Israel and Defendants knew or had reason to believe such actions of their customers. In an effort to refute Plaintiff's claims and also establish that there was no reason to believe such allegations, Defendants' evidence purports to show that they investigated Plaintiff's complaints over the years, were informed by their customers that they were not selling or delivering to Israel, and reiterated to their customers that they were not to sell Bali products in Israel, thus giving Defendants no reason to believe their customers were the source of parallel imports. Based upon the evidence, whether or not Defendants knew or had reason to believe that their customers were likely to resell or deliver Bali branded intimate apparel in Israel is a genuine issue of material fact precluding summary judgment for either party.

On cross motion, Defendants have also moved for summary judgment as to Plaintiff's claim that Defendants breached the 2004 Distributorship Agreement. (Docket Entry 226.) As the Court has previously concluded there is a genuine issue of material fact as to whether Defendants had reason to believe that their customers were selling products to Israel. Defendants' cross-motion substantially addresses the same issue raised in Plaintiff's cross-motion as to whether Defendants had knowledge or reason to believe their customers had a role in parallel imports. Defendants' argument regarding "first-quality" Bali intimate apparel has been previously discussed as well as to Atlantic Hosiery or Hosiery Street's actions during the term of the 2004 Distributorship Agreement. Thus, there is no need for further discussion on this motion. Defendants' cross-motion as to Plaintiff's claim for breach of the 2004 Distributorship Agreement should also be denied.

## E. Cross-motions for Partial Summary Judgment as to Defendants' Counterclaim for Breach of the 2004 Distributorship Agreement.

Both parties have also filed cross-motions for summary judgment as to Count II of Defendants' counterclaim asserting that Plaintiff breached the 2004 Distributorship Agreement regarding advertising strategies, annual statements, rolling forecasts, quarterly sales statements, and provisions related to termination procedures. (*See* Countercl. ¶¶ 27-30, 40-41, 43, 94-105, Docket Entry 176.) On cross motion, Plaintiff asserts that (1) Defendants' breach of the same agreement excused Plaintiff's performance;[21] (2) by course of performance, Defendants waived some portions of their counterclaims; and (3) a portion

---

[21] Plaintiff and Defendants' arguments as to excuse of performance by Plaintiff based upon non-performance of Defendants are moot as the Court has previously concluded that there is a genuine issue as to whether Defendants had reason to believe their customers were sources of parallel imports in Israel.

of Defendants' claims are barred by the statute of limitations. (*See* Pl.'s Br. at 21-25, Docket Entry 223.) Defendants contend that Plaintiff's failures to perform independent promises are not excused, the statute of limitations does not bar Defendants' compulsory claims, and Defendants have not waived any portion of their counterclaims. (*See* Defs.' Br. at 19-25, Docket Entry 245.)

The 2004 Distributorship Agreement reads in part:

[D]ISTRIBUTOR will provide SLBA with a twelve (12)-month rolling forecast estimating DISTRIBUTOR's requirements for Products by styles, the first such rolling forecast to be provided within thirty (30) days before the beginning of the second Agreement Year.

. . .

[DISTRIBUTOR shall] furnish to SLBA, not later than forty-five (45) days following the end of each calendar quarter, accurate reports, certified by its chief financial officer, stating sales of the Products (in units and currency) made by DISTRIBUTOR for each month during the period in question, the prices at which such Net Sales were made and providing such other information as SLBA may otherwise reasonably request.

. . .

DISTRIBUTOR will provide SLBA with an annual statement, certified by its within forty-five (45) days after the end of each Agreement Year showing its advertising and sales promotion expenditures during such Agreement for the Territory.

. . .

DISTRIBUTOR shall provide SLBA, within fifteen (15) days of such termination or expiration, with a written inventory of the quantities of its unsold stock of Products and related advertising and promotional materials . . .

(Distributorship Agreement ¶¶ 3(a), 4(f), 5(g), 9(b), Docket Entry 227-1.)

Plaintiff argues that Defendants lodged no complaints about provisions in the agreement related to advertising expenditures, rolling forecasts, annual statements and quarterly sales

35

statements until six weeks before the distributorship ended. Plaintiffs contend that at one point Defendants were unconcerned about Plaintiff providing rolling forecasts since they were so small to Defendants. (Sixth Lissauer Decl. ¶ 17, Docket Entry 189.) Based upon the course of performance between the parties over the years, Plaintiff argues that Defendants waived portions of their counterclaims.

With regard to Plaintiff's obligation to provide a written inventory of the unsold quantities of Bali products following the expiration of the Distributorship Agreement, Plaintiff asserts that there was no need to provide an inventory list since Defendants already gave written notice of their decision not to exercise their option to purchase any remaining products. One year after termination of the agreement, Defendants demanded the inventory only after Plaintiff inquired about Defendants' plans to hire a new distribution company. (Sixth Lissauer Decl. ¶¶ 27-28 & Exs. 44, 45, 46, Docket Entry 189.) In response and on cross motion, Defendants assert that they were not required to request the inventory list, and in any event, the agreement contains a non-waiver[22] clause which required Plaintiff to perform regardless of Defendants' actions.

The anti-waiver provision states:

> The failure of either party hereto at any time to require performance by the other of any provision hereof shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either party hereto of a breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

---

[22] Defendants also assert that the non-wavier clause applies to the requirement that Plaintiff provide rolling forecasts, quarterly sales statements, and annual statements regarding advertising expenditures. (*See* Defs.' Br. at 10 n.4, Docket Entry 225.)

(2004 Distributorship Agreement, ¶ 12(f), Docket Entry 227-1.)   It is undisputed that Plaintiff did not provide the inventory list within 15 days of termination of the agreement. (*See* Lissauer Dep. at 5, Ex. B, Docket Entry 225-2.)   Additionally, Lissauer admits that Plaintiff did not provide the reports required by paragraphs 3(a), 4(f), and 5(g) with one exception. Over the term of the agreement, Lissauer provided one report under paragraph 5(g) after the 2004-2005 Agreement year.[23]

Plaintiff seeks to have the Court find as a matter of law that Defendants waived the contract provisions asserted in its counterclaims. "Waiver is an intentional relinquishment or abandonment of a known right or privilege." *Medearis v. Trustees of Meyers Park Baptist Church*, 148 N.C. App. 1, 10, 558 S.E.2d 199, 206 (2001) (internal quotations omitted).   "A waiver is implied when a person dispenses with a right 'by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right'." (*Id.* at 12, 558 S.E.2d at 206-07 (internal citations omitted).)   Generally, anti-waiver clauses can be waived also. (*See* 13 *Williston on Contracts* § 39:36 (4th ed. 2000)) ("The general view is that a party to a written contract can waive a provision of that contract by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver or failure to enforce clause in the contract.")

Plaintiff asserts that the statute governing "no oral modification" and the North Carolina commercial code's silence on "no waiver" clauses is strong indication that such clause is invalid. (*See* N.C. Gen. Stat. § 25-2-209(4).)   Defendants argue, and the Court agrees that this statute does not completely negate a "no waiver" clause.  Plaintiff also asserts

---

[23] Defendants assert that Lissauer was still out of compliance with the agreement because the report had to be certified by Plaintiff's chief financial officer which it never had. (*See* Lissauer Dep. at 4-5.)

N.C. Gen. Stat. § 25-1-303(f) which indicates that the course of performance between parties is relevant to waiver. *See* N.C. Gen. Stat. § 25-1-303(f) ("a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance"). Defendants contend, however, that N.C. Gen. Stat. § 25-2-202 negates this argument because the parties may control the use of extrinsic evidence such as course of performance between the parties. (*See* N.C. Gen. Stat. § 25-2-202; *see also Ace, Inc. v. Maryland*, 108 N.C. App. 241, 244-246, 423 S.E.2d 504, 507-508 (1992) (course of performance is extrinsic evidence).) The Court here does not find that the paragraph 12(f) of the Distributorship Agreement expressly states that the parties cannot use extrinsic evidence, but rather outlines the timing of required performance.

The inapplicability of N.C. Gen. Stat § 25-2-202 does not automatically suggest that consideration of the course of performance is the end inquiry. N.C. Gen. Stat. § 25-1-303(f) authorizes the use of extrinsic evidence to determine if waiver has occurred; however, the Court should read this together with North Carolina's common law position on "no waiver" clauses.[24] "No waiver" clauses have been held enforceable. (*See Woodridge Homes Ltd. P'ship v. Gregory*, 205 N.C. App. 365, 373, 697 S.E.2d 370, 376 (2010); *BB&T Factors Corp. v. Global Airways Freight Forwarding, Inc.*, No. COA03-1565, 2004 WL 2793323, at *4 (N.C. Ct. App. Dec. 7, 2004).) In enforcing a "no waiver" clause, the North Carolina Court of Appeals has held that the "no waiver" clause itself can also be waived:

> The general view is that a party to a written contract can waive a provision of that contract by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver or failure to enforce clause in the contract.

---

[24] *See* N.C. Gen. Stat. § 25-1-103(b).

This is based on the view that the nonwaiver clause itself, like any other term of the contract is subject to waiver by agreement or conduct during performance.

*42 E., LLC v. D.R. Horton, Inc.*, 722 S.E.2d 1, 7 (N.C. Ct. App. 2012) (internal quotations and citations omitted) (citing *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, 245 P.3d 184, 196 n. 8 (2010).) Thus, the "no waiver" clause does not preclude determination of whether Defendants through their conduct have waived certain provisions in the 2004 Distributorship Agreement.

As to the requirements for rolling forecasts, and quarterly and annual statements, Plaintiff asserts that Defendants' course of performance during the term of the contract led Plaintiff to believe that Defendants did not care about or require such reports. On one occasion, Plaintiff sought Defendants' input about rolling reports in which Ms. Laurence Jaillet, Defendants' export manager, indicated Plaintiff's company was too small for Defendants to care about rolling forecasts. (*See* Ninth Lissauer Decl. ¶ 6, Docket Entry 241.) Plaintiff further asserts that Defendants did not raise concerns about such statements when they proposed the 2004 Distributorship Agreement. (*Id.* ¶ 3, 7.) Plaintiff relied on Defendants' conduct and continued to buy without providing rolling forecasts and statements. (Id. ¶ 8.) These actions constituted waiver on the part of Defendants.

Defendants assert that if any waiver has occurred, Defendants retracted such waiver pursuant to N.C. Gen. Stat. § 25-2-209(5). The statute reads:

A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

39

(N.C. Gen. Stat. § 25-2-209(5).) Defendants assert that retraction occurred prior to termination of the agreement when they sent letters to Plaintiff on two separate occasions notifying Plaintiff of the reporting requirements. (*See* Ninth Lissauer Decl. ¶ 9 & Ex. 42, Docket Entry 241; Ex. A, Docket Entry 258.) The June 18, 2007 letter states, "There are specific provisions in the license agreement dealing with how the relationship between us must be concluded." (Ex. A, Docket Entry 258.) Based upon Plaintiff's argument that it never received the June 18, 2007 letter and Defendants' notification to Plaintiff that it was in breach of several terms in a May 16, 2007 letter, it is unclear whether retraction had occurred.

Nevertheless, Defendants should be estopped from claiming that Plaintiff was required to provide rolling forecast, and quarterly and annual statements. Under North Carolina law, the doctrine of equitable estoppel applies:

> when any one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

(*Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 17, 591 S.E.2d 870, 881 (2004) (quoting *State Highway Comm'n. v. Thornton*, 271 N.C. 227, 240, 156 S.E.2d 248, 258 (1967) (internal quotations omitted).) Reliance by the party asserting the defense is an essential element.[25]

(*Countrywide Home Loans, Inc. v. Bank One, N.A.*, 190 N.C. App. 586, 590-591, 661 S.E.2d 259,

---

[25] Under the doctrine of estoppel, the elements related to the party claiming the estoppel are: "(1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially." *Id.* (citing *Peek v. Wachovia Bank & Trust Co.*, 242 N.C. 1, 11-12, 86 S.E.2d 745, 753 (1955) (quotations omitted).

40

263 (2008).) Plaintiff's argument of estoppel is similar to its waiver argument in that Plaintiff relied upon Defendants' unconcern for reports as they continued on with the contract. Plaintiff supports its position with *Mulberry-Fairplains Water Ass'n, Inc. v. Town of N. Wilkesboro*, 105 N.C. App. 258, 268-269, 412 S.E.2d 910, 917 (1992).[26] In that case, the plaintiff contracted with the defendant to supply a certain amount of water. (*Id.* at 260, 412 S.E.2d at 912.) For a number of years, the defendant supplied water in excess of the terms of the agreement. (*Id.*) The plaintiff filed a breach of contract claim on one provision of the contract and Defendants asserted that the 15,000,000 gallon cap had to be strictly enforced. (*Id.* at 261, 412 S.E.2d at 912-913.) The Court of Appeals held that "[u]nder the circumstances, . . . it would grossly offend the principles of equity to allow defendant to now deny that such modification took place in order to enforce the quantity provision in a manner inconsistent with its conduct for the preceding fifteen years." (*Id.* at 268, 412 S.E.2d at 917.)

In the present case, for several years of the agreement, Defendants did not require reporting by Plaintiff. Plaintiff failed to provide the reports in reliance upon Defendants' conduct, particularly in light of Defendants' export manager's statement indicating Defendants' lack of concern for the matter. Defendants never objected to not receiving the forecasts and statements over the years. (Ninth Lissauer Decl. ¶ 8, Docket Entry 241.) Plaintiffs continued to buy from Defendants without providing the reports. It was only near termination of the agreement when Defendants gave any reference to the reporting

---

[26] Defendants argue that *Mulberry-Fairplains* is inapplicable as it contains a "no waiver" clause and then cites cases in which courts have held that the defenses of waiver and estoppel were defeated by an anti-waiver provision. (*See* Defs.' Reply Br. at 11-12, Docket Entry 258.) Defendants fail to consider, however, that an anti-waiver provision may also be waived. (*42 E., LLC*, 722 S.E.2d at 7.)

requirements. (*Id.* at ¶ 9 & Ex. 42.) The Court finds that Plaintiff relied upon Defendants' conduct and actions over the course of some years, and Defendants are now estopped from claiming that Plaintiff was required to provide rolling forecasts, and quarterly and annual statements. To the extent Defendants' counterclaim asserts alleged breaches of paragraphs 3(a), 4(f), and 5(g) of the 2004 Distributorship Agreement, summary judgment should be granted in favor of Plaintiff.

With regard to the requirement to provide a written inventory of unsold quantities set out in paragraph 9(b) of the agreement, Plaintiff's position is that such language was conditional upon Defendants' decision to exercise its option to purchase such inventory, thus Defendants' letter indicating that they would not exercise their option to purchase makes the inventory list pointless. However, Defendants assert that such language in the provision is not conditional and Plaintiff was required to provide a written inventory regardless of their option to purchase. In looking at the express language of paragraph 9(b), the provision of the agreement speaks for itself, and the interpretation of the parties' intent is clear and obvious. Defendants' need for a written inventory list from Plaintiff upon termination of the agreement was so that Defendants could determine if they wanted to exercise their option to purchase any or all of the products. The provision in its entirety confirms this. Defendants' own conduct precluded any obligation for Plaintiff to provide such list. There is no other practical way to interpret this. (*See Peaseley v. Virginia Iron, Coal & Coke Co.*, 282 N.C. 585, 601, 194 S.E.2d 133, 144 (1973) ("The best evidence of the intention of the parties to a contract is the practical interpretation given to their contracts by the parties while engaged in their performance."). The Court concludes that Plaintiff did not

42

breach paragraph 9(b) of the Distributorship Agreement requiring Plaintiff to provide a written inventory upon termination of the agreement as Defendants' conduct waived this requirement.[27]

Both parties also assert arguments as to additional post-termination provisions. In their counterclaim for breach of the 2004 Distributorship Agreement, Defendants allege that Plaintiff failed to stop selling products and using Defendants' advertisement after the post-termination sell-out period. The 2004 Distributorship Agreement reads in part:

> DISTRIBUTOR shall have no rights in or to the format and content of any labeling, packaging, advertising, or promotional materials in whatever medium, and displays used by DISTRIBUTOR to promote the Products, other than the right to use such materials solely to promote the Products during the term of this Agreement. Upon and after the expiration or termination of this Agreement for whatever reason or, if applicable, the end of the post termination sell-out period (as described below), DISTRIBUTOR shall not use or in any manner imitate any such labeling, packaging, advertising and promotional materials.
>
> . . .
>
> Upon the termination or expiration of this Agreement, or, if applicable, the end of the post-termination sell-out period (as described above), DISTRIBUTOR shall discontinue at once all use of the SLBA Trademarks and neither DISTRIBUTOR nor any of its Affiliates or Principals shall thereafter use any trademarks or trade names which are similar to or imitative of the SLBA Trademarks or which are likely to cause confusion with or be mistaken for the SLBA Trademarks; nor shall DISTRIBUTOR make reference to its past relationship with SLBA.
>
> . . .
>
> DISTRIBUTOR shall have a period of ninety (90) days to sell in the Territory such of its remaining stock of Products as SLBA may elect not to buy from DISTRIBUTOR under subparagraph (b) above. At the end of this period of ninety (90) days, DISTRIBUTOR shall destroy or render useless, all printed

---

[27] Defendants' request for the written inventory nearly one year *after* the agreement ended does not alter the Court's conclusion.

materials, documents, presentation materials, stamps, labels, cartons, fixtures, advertising or promotional materials, and any other objects bearing the SLBA Trademarks, regardless of whether or not they may be usable. DISTRIBUTOR shall have the responsibility of making sure that all use of the SLBA Trademarks by its representatives, employees, attorneys-in-fact and agents shall have ceased at the end of the aforesaid period of ninety (90) days.

(Distributorship Agreement ¶¶ 5(e), 7(c), 9(c), Docket Entry 227-1.)

By the terms of the Agreement, Plaintiff was allowed to sell Defendants' products and use Defendants' trademarks and advertisements until the end of the post-termination sell-out period on September 27, 2007. (*See id.* ¶ 9(c).) By evidence of two screenshots of Plaintiff's website taken after this date, Plaintiff concedes to continued use of advertisements and Defendants' trademarks after the post-termination sell-out period. (Lissauer Dep. at 184-187 & Exs. 80-81, Docket Entry 225-2.) Most of Plaintiff's argument is conditional upon the Court's finding that Defendants were in breach of the 2004 Distributorship Agreement.[28] The Court concludes that there is a genuine issue as to Defendants' breach of the agreement, therefore the Court will not address Plaintiff's argument on that point. Plaintiff also asserts that waiver has occurred based upon Defendants' own post-termination conduct. As early as October 15, 2007 (weeks after the post-termination sell-out period ended), Defendants knew that Plaintiff's website listed certain products and for eight months Defendants remained completely silent about the issue. (*See* Ninth Lissauer Decl. ¶¶ 11, 13, Docket Entry 241.) It was only after Plaintiff's inquiry about future distributions in Israel that Defendants requested that Plaintiff remove Defendants' information from the website. (*Id.* ¶¶ 13-14; Ex. 45, Docket Entry 189-6.) "The intention to waive may be expressed or

---

[28] This relates to Count II of Defendants' counterclaim in its entirety. (*See* Pl.'s Br. at 21-22, Docket Entry 223; *see also* Defs.' Br. at 7-9, Docket Entry 225.)

implied from acts or conduct that naturally lead the other party to believe that the right has been *intentionally* given up." *Patterson ex rel. Jordan v. Patterson*, 137 N.C. App. 653, 667, 529 S.E.2d 484, 492 (2000) (quoting *Klein v. Insurance Co.*, 289 N.C. 63, 68, 220 S.E.2d 595, 598–99 (1975) (emphasis added).) Here, the Court is unable to conclude that Defendants lead Plaintiff to believe that removal of Defendants' information from the website was no longer necessary since there is no evidence that Plaintiff had knowledge of Defendants' awareness of the website as early as October 15, 2007. Therefore, no waiver occurred.[29]

## III. CONCLUSION

For the reasons stated above, the following is recommended:

I.      The Court should grant in part and deny in part Plaintiff's renewed motion (Docket Entry 218) for partial summary judgment:

(1) Grant Plaintiff's motion as to Count I of Defendants' Counterclaim for breach of the 2004 Settlement Agreement;

(2) Deny Plaintiff's motion as to Defendants' breach of the 2004 Distributorship Agreement;

(3) To the extent Count II of Defendants' counterclaim asserts an alleged breach of paragraphs 3(a), 4(f), 5(g), and 9(b) of the 2004 Distributorship Agreement, Plaintiff's motion should be granted. Otherwise, it should be denied.

---

[29] To the extent Plaintiff asserts estoppel, this argument also fails because it requires reliance upon Defendants' conduct in which there is no evidence that Plaintiff were aware of such conduct as early as October 15, 2007.

II.     The Court should deny Defendants' motion (Docket Entry 226) for partial summary judgment as to Plaintiff's claim for breach of the 2004 Distributorship Agreement;

III.    To the extent Count II of Defendants' counterclaim asserts an alleged breach of paragraphs 5(e), 7(c), and 9(c) of the 2004 Distributorship Agreement, Defendants' motion (Docket Entry 224) should be granted. Otherwise, it should be denied.

Furthermore, IT IS ORDERED that Defendants' motions to strike (Docket Entries 247 and 260) are GRANTED in part and DENIED in part as previously set out in this opinion. Plaintiff's motion to strike (Docket Entry 264) is GRANTED in part and DENIED in part as previously set out in this opinion.

Joe L. Webster
United States Magistrate Judge

September 3, 2013
Durham, North Carolina